**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MTR GAMING GROUP, INC.,      )
          )
          Plaintiff,      )     Case No.  1:11-cv-208-SJM
          )
      v.        )
          )
EDSON R. ARNEAULT,      )
          )
          Defendant.      )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District J.,

      In this civil action, Plaintiff MTR Gaming Group,Inc. ("MTR") has sued its former CEO, shareholder, and consultant -- Defendant Edson R. Arneault -- for alleged breach of contract, tortious interference with a contract, and violations of Pennsylvania's Trade Secrets Act. As the parties here are of diverse citizenship, this Court's jurisdiction is premised upon 28 U.S.C. §1332.

      Presently pending in this matter is Arneault's motion to dismiss the complaint pursuant to Rule 12(b)(3) and/or Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow Arneault's motion will be granted in part and denied in part.

## I.    STANDARD OF REVIEW

      Under Federal Rule of Civil Procedure 12(b)(3), a defendant may seek to dismiss a case on the basis of improper venue. This rule is designed "to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir.1994) (*quoting*

*LeRoy v. Great W. United Corp.*, 443 U.S. 173, 183–184 (1979)).  When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(3), a court must accept as true the allegations in the complaint, unless contradicted by the defendant's affidavits.  *Baker v. Berman*, Civil Action No. 09–1061, 2009 WL 3400941 at *2 (W.D. Pa. Oct. 21, 2009) (citing *Campanini v. Studsvik, Inc.*, CA No. 08–5910, 2009 WL 926975 (E.D. Pa. Apr. 6, 2009)).  While the court may consider facts outside the complaint to determine the proper venue, all reasonable inferences must be drawn in the plaintiff's favor.  *Id.* (citing *Fellner v. Philadelphia Toboggan Coasters, Inc.*, CA No. 05–2052, 2005 WL 2660351 (E.D. Pa.Oct.18, 2005)).

     Rule 12(b)(6) allows for the dismissal of a cause of action which, as a legal matter, fails to state a claim upon which relief can be granted.  In ruling upon a motion to dismiss pursuant to this rule, "all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them."  *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, --- F.3d ----, 2012 WL 2433508 at *3 (3d Cir. June 28, 2012) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir.2009)).  In adjudicating a Rule 12(b)(6) motion, we consider not only the complaint but also any exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir.2010). If, after accepting all well-pleaded allegations of the complaint as true, the plaintiff's claim(s) still lack facial plausibility, then dismissal of the claim(s) is appropriate.  *Treasurer of New Jersey v. U.S. Dept. of Treasury,* 684 F.3d 382, ---- (3d Cir. 2012) (citing *Warren Gen. Hosp. v. Amgen Inc.*,

643 F.3d 77, 84 (3d Cir. 2011); Fed. R. Civ. P. 12(b)(6)).  *See also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007).

With the foregoing standards in mind, we discuss below the relevant background facts, as gleaned from the complaint and other appropriate Rule 12(b)(6) materials.

## II.    BACKGROUND

MTR is a Delaware corporation engaged in the gaming business with a satellite office in Wexford, Pennsylvania.  Among the gaming businesses which MTR owns and operates is Presque Isle Downs & Casino ("PIDI"), a racetrack and casino located in Erie, Pennsylvania.  (Complaint [1] at ¶ 1.)

Defendant Edson R. Arneault, currently a Florida resident, was the former CEO and a significant shareholder of MTR from 1995 to 2008.  (Complaint at ¶ 2, 7.)  As such, Arneault acquired knowledge of and access to MTR's confidential, proprietary trade secrets.  (Id. at ¶ 8.)

On or about April 21, 2008, Arneault advised MTR's Board that he did not intend to continue as CEO after his then current employment contract expired at the end of that year.  (Complaint ¶ 9.)  Upon stepping down as CEO, Arneault became a consultant to MTR pursuant to a consulting agreement dated October 15, 2008 (hereinafter referred to as the "Consulting Agreement").  (Id. at ¶ 10 and Ex. 1.)  Paragraph 8 of the Consulting Agreement contained a non-compete clause which placed certain restrictions on Arneault's participation in the gaming business for a period of thirty months, or until April 30, 2011.  (Id. at ¶ 11.)  These restrictions applied within a one-hundred fifty (150) mile radius of "any current office, site and/or facility owned or

leased by MTR…" (Id.) At some point, Arneault and MTR also entered into a deferred compensation agreement (the "Deferred Compensation Agreement"). (Complaint Ex. 2 [1-3] at p. 1.)[1]

Disputes later arose between MTR and Arneault concerning the terms of the Deferred Compensation Agreement, resulting in Arneault filing a lawsuit against MTR in the Circuit Court of Hancock County, West Virginia (referred to herein as the "West Virginia Lawsuit"). (Complaint Ex. 2 [1-3] at p. 1.) In February 2010, the parties entered into a settlement agreement and release of claims (hereinafter, referred to as the "Settlement Agreement"), through which MTR and Arneault purported to "finally and completely … resolve, compromise and settle and any all claims related to the West Virginia Lawsuit, the [Deferred Compensation Agreement] and, with the exceptions contained in this [Settlement] Agreement, all claims under the Consulting Agreement." (Complaint [1] at ¶ 12 and Ex. 2 [1-3] at p. 1.)

Under the terms of the Settlement Agreement, Arneault was paid $1.6 million in full satisfaction of the claims and rights he had against MTR. (Complaint at ¶ 13; Ex. 2 at ¶ 2.2.) Relevantly, under the terms of the Settlement Agreement, the non-compete clause contained in Paragraph 8 of the Consulting Agreement would remain in effect until April 30, 2011, but "the geographic limitations [would] be reduced to 100 miles." (Complaint at ¶ 14; Ex. 2 at ¶ 2.3.)

Since at least September 10, 2010, Arneault has been a shareholder and principal with an entity known as American Harness Tracks, LLC ("AHT"). (Complaint

---

[1] All pagination refers to the internal pagination appearing at the bottom of the referenced document, as opposed to the Court's official CM/ECF page numbering located at the top of the page.

¶15.) Public documents establish that AHT was formed on or about September 10, 2010 for the purpose of owning and operating a racetrack and casino in Lawrence County, Pennsylvania – a distance within one hundred miles of MTR's racetrack and casino businesses, including PIDI. (Id. at ¶ 16, 19.) AHT's business model includes, among other things, a Category 1 slot machine facility and related gaming activities – activities that MTR claims directly compete with its own gaming businesses. (Id. at ¶ 20.) MTR alleges that, in establishing its gaming business in Lawrence County, AHT has been using strategies, models, designs and plans developed by MTR, of which Arneault had acquired knowledge through his prior relationship with MTR and to which he had complete access while employed by MTR. (Id. at ¶ 18.)

On April 15, 2011, Arneault filed in this Court a civil case captioned *Arneault, et al. v. O'Toole, et al.,* Civil Action No. 1:11-cv-95-SJM (W.D. Pa.) (hereinafter, the "Civil Rights Action"), naming as Defendants MTR, several current and former executives and directors of MTR, MTR's subsidiary PIDI, and numerous public officials associated with the Pennsylvania Gaming Commission. (Complaint ¶ 5.) Arneault's co-Plaintiff in the Civil Rights Action was Gregory Rubino, a commercial real estate agent and developer who is also President of Passport realty, LLC and Passport Development, LLC, located in Erie County. (See generally *Arneault, v. O'Toole, supra,* Amended Complaint [50] at ¶¶ 2, 49-55.) In the Civil Rights Action, Arneault and Rubino asserted causes of action against the MTR Defendants for alleged conspiracy to violate the Plaintiffs' civil rights as well as for unjust enrichment and promissory estoppel. (*See id.* at ¶¶ 417-50.)

MTR commenced the instant lawsuit on September 16, 2011 based on Arneault's prosecution of the Civil Rights Action and his involvement with AHT. MTR's complaint

includes the following six causes of action:  a claim for breach of contract premised upon Arneault's alleged violation of the non-compete clause in the Consulting Agreement as amended by the Settlement Agreement (Count 1); a claim for breach of contract premised upon Arneault's alleged violation of the covenant not to sue contained in the Settlement Agreement (Count 2); a claim for tortious interference with a contractual relationship premised upon Arneault's alleged involvement in soliciting Rubino to join in the Civil Rights Action (Count 3); a claim for breach of contract premised upon Arneault's alleged violation of the non-disclosure and confidentiality clauses of the Settlement Agreement (Count 4); a claim for breach of contract premised upon Arneault's alleged violation of the non-disparagement clause contained in the Settlement Agreement (Count 5); and a claim for the alleged violation of Pennsylvania's Trade Secrets Act premised upon Arneault's activities while associated with AHT (Count 6).

Presently pending before me is Arneault's motion to dismiss the complaint pursuant to Rules 12(b)(3) and/or 12(b)(6) of the Federal Rules of Civil Procedure.  In support of this motion, Arneault has argued that this Court is not the proper venue for purposes of litigating Counts 1, 2, 4 and 5 of the complaint and that, in any event, all of MTR's claims are barred by virtue of a release provision contained in the Settlement Agreement.  Arneault has also challenged the sufficiency of MTR's allegations as it pertains to various individual counts.  The matter has been fully briefed and argued and is ripe for disposition.

### III.    DISCUSSION

A.  <u>Arneault's Motion to Dismiss Counts 1, 2, 4 and 5 Based on Improper Venue</u>

Arneault claims that the forum selection clause in the Settlement Agreement requires dismissal of Counts 1, 2, 4 and 5 because the proper venue for these counts is in the state court of Hancock County, West Virginia.  Paragraph 4.4 of the Settlement Agreement provides, in relevant part, that "[a]ny dispute arising from this agreement shall be interpreted pursuant to the laws of West Virginia and venue shall exclusively vest with the Circuit Court of Hancock County, West Virginia."  (Complaint Ex. 2 [1-3] at ¶ 4.4.)  Arneault contends that Counts 1, 2, 4 and 5 arise out of the Settlement Agreement and are therefore controlled by the Agreement's forum selection clause. MTR agrees that Counts 2, 4 and 5 arise out of the Settlement Agreement but it maintains that the forum selection clause is not controlling here.

In federal cases premised on diversity jurisdiction, the effect to be given a contractual forum selection clause is determined by federal law rather than by state law because "[q]uestions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995) (quoting *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir.1991)).  Under federal law, forum selection clauses are entitled to "great weight" and are presumptively valid.  *Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006) (citing cases).  Of "paramount" importance is "the intent of the parties." *Id.* (citation omitted).

Our Circuit Court of Appeals has instructed that we should "determine contractual waiver of federal jurisdiction using the same benchmarks of construction as we employ

in resolving all preliminary contractual questions." *Cowatch v. Sym-Tech Inc.,* 253 Fed. Appx. 231, 232 (3d Cir. 2007) (citing *Foster v. Chesapeake Ins. Co.,* 933 F.2d 1207, 1217 n. 15 (3d Cir. 2007)). More specifically, "[w]e ascertain the intent of the parties to a written agreement from the writing itself, and where the words contained in the agreement are clear and unambiguous, we enforce them." *Id.* (citing *Martin v. Monumental Ins. Co.*, 240 F.3d 223, 232-33 (3d Cir.2001)). Further, "[w]e will consider extrinsic evidence only where the language of the agreement itself is ambiguous." *Id.* (*citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 n. 9 (3d Cir.1980)).

Here, the plain language of the forum selection clause contemplates that, as to claims arising from the Settlement Agreement, "venue shall exclusively vest with the Circuit Court of Hancock County, West Virginia." MTR does not contend that this phrase is ambiguous in its meaning.[2] Instead, MTR contends that the forum selection clause should not be given effect, either because Arneault improperly invoked Federal Rule 12(b)(3) rather than Rule 12(b)(6) or because the clause has been waived by virtue of Arneault's commencement of the Civil Rights Action in this Court.

We may dispose of MTR's first objection rather summarily. MTR accurately notes that, when a forum selection clause specifies only a non-federal forum as the appropriate venue, transfer of the claim under 28 U.S.C. §§ 1404 or 1406 is unavailable, dismissal is the only appropriate remedy, and Rule 12(b)(6) provides a

---

[2] Because the phrase is clear and unambiguous, our interpretation of the clause and our analysis of its effect as to Counts 1, 2, 4 and 5 would not differ whether we apply federal principles of contract interpretation or West Virginia law.

proper mechanism for effectuating such a dismissal. *See Wall Street Aubrey Golf, LLC, v. Aubrey,* 189 Fed. Appx. 82, 84 n. 1 (3d Cir. 2006); *Salovaara v. Jackson Nat'l Life Ins. Co.,* 246 F.3d 289, 298-99 (3d Cir. 2001). However, as the Court observed in *Salovaara,* there has been "much disagreement over whether dismissal (where appropriate) should be made pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(3), or 12(b)(6)." 246 F.3d at 298 n. 6 (citing cases). *See also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1352 at 318-19 (3d ed. 2004) ("The courts of appeal are split as to whether dismissal of [an] action is proper pursuant to Rule 12(b)(3) or Rule 12(b)(6) when it is based on [a] forum selection clause rather than on noncompliance with a federal venue statute; most of the decided cases use the former rule as the basis, however."). I find that denial of Arneault's motion based solely on his invocation of Rule 12(b)(3) rather than Rule 12(b)(6) would unduly elevate form over substance. Instead, I will construe his motion as essentially seeking dismissal of Counts 1, 2, 4 and 5 pursuant to either subsection of Rule 12(b) based on the language of the forum selection clause.

This brings me to MTR's more substantive objection, which is its claim that Arneault has waived his contractual right to enforce the forum selection clause by virtue of having filed the Civil Rights Action in this Court. MTR posits that a forum selection clause will be disregarded where enforcement would be "unreasonable" under the circumstances. Such unreasonableness, according to MTR, includes situations "where a party has waived its right to enforce the clause by its conduct or action." (MTR Gaming Group's Br. in Opp. To Arneault's Mot. to Dismiss the Complaint [13] at p. 13.) MTR believes that the claims asserted against it by Arneault in the Civil Rights Action

arose out of the Settlement Agreement such that they should have been filed in the Circuit Court of Hancock County, West Virginia. Because Arneault asserted those claims in federal district court in Erie, Pennsylvania, MTR reasons, Arneault has waived any contractual right to litigate in Hancock County the pending breach of contract claims arising out of the Settlement Agreement. I find this argument unconvincing.

The Supreme Court has held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1973). *See also Foster v. Chesapeake Ins. Co., Ltd.*, 933 F.2d 1207, 1219 (3d Cir. 1991). "A forum selection clause is 'unreasonable' where the defendant can make a 'strong showing' … either that the forum thus selected is 'so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court, …*or* that the clause was procured through 'fraud or overreaching.'" *Foster,* 933 F.2d at 1219 (quoting *Bremen, supra,* at 15, 18) (internal citations omitted). *See also MoneyGram Payment Systems, Inc. v. Consorcio Oriental, S.A.,* 65 Fed. Appx. 844, 846 (3d Cir. May 21, 2003) ("a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would in the particular circumstances of the case result in jurisdiction so seriously inconvenient as to be unreasonable.")(*quoting Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983)). None of the aforementioned circumstances is alleged to exist here.

In support of its argument that a party's conduct can constitute grounds for disregarding a forum selection clause, MTR cites *American Int'l Group Europe S.A. (Italy) v. Franco Vago Int'l, Inc.*, 756 F. Supp. 2d 369 (S.D.N.Y. 2010); *Building Construction Enterprises, Inc. v. Garry Meadows Construction Co., Inc.,* No. 3:06-CV-92 GTE, 2007 WL 1041003 (E.D. Ark. April 4, 2007); *Unity Creations, Inc. v. Trafcon Industries, Inc.*, 137 F. Supp. 2d 108 (E.D.N.Y. 2001); *In Rationis Enterprises, Inc. of Panama*, No. 97 CV 9052 (RO), 1999WL6364 (S.D.N.Y. 1999), and *Building Services Inst. ("BSI") v. Kirk Williams Servs. Co*., 2008 WL 747657 (Oh. 2008). None of these cases represent controlling law within this judicial district.[3]

However, even if these cases articulate a principle that would be recognized in this circuit, I find that the waiver rule would be inapplicable given the facts presented here. As MTR acknowledges, "[w]aiver is a voluntary relinquishment of a known right, and can occur when a party intentionally acts in a manner inconsistent with claiming that right." (MTR's Br. in Opp. to Arneault's Mot. to Dismiss [13] at 14) (citing cases). In the rulings cited by MTR, the basis for inferring a voluntary relinquishment of the contractual venue "right" was clear because the plaintiff was suing directly upon a contract containing a forum selection clause but the suit was brought in a venue not

---

[3] MTR also relies on *Vangura Kitchen Tops, Inc. v. C & C North America, Inc.*, No. 08cv1011, 2008 WL 4540186 (W.D. Pa. Oct. 7, 2008). Although that decision was issued by a sister court within the Western District of Pennsylvania, it does not discuss or apply the waiver principle at issue here. In *Vangura,* the district court rejected application of a forum selection clause laying venue in the federal district court in Minnesota based on its analysis under 28 U.S.C. §1404(a) – a provision which does not pertain here because transfer of the present case to a nonfederal forum under § 1404 is not an option. Ultimately, the court in *Vangura* concluded that the forum selection clause should not be given dispositive effect because Pennsylvania was "by far, the most appropriate venue in which to proceed," while Minnesota "ha[d] little or nothing to do with th[e] case, other than being a passive repository of federal court venue" by virtue of the subject forum selection clause. 2008 WL 4540186 at *1 and 11. The same could not be said of the West Virginia circuit court as it pertains to this case. Thus, I do not view *Vangura* as supportive of MTR's waiver argument.

contemplated by the clause. When a party chooses to file suit upon a contract in an unauthorized venue in direct contravention to the contract's forum selection clause, it is not surprising that courts would infer the party's abandonment of its rights under the forum selection provision. *See, e.g., Unity Creations, Inc.,* 137 F. Supp. 2d at 111 ("In New York, when a party disregards a forum selection clause and sues on a contract in an unauthorized forum, it waives the forum selection clause on the claims it pursues."); *Building Construction Enterprises, Inc.*, 2007 WL 1041003 at *4 (plaintiff waived its right to have action adjudicated in forum designated by forum selection clause where it elected to file suit for breach of the subject contract in another forum); *Building Services Institute*, 2008 WL 747657 at *2 (same).[4]

In this case, however, the connection between Arneault's claims in the Civil Rights Action and the Settlement Agreement are much more attenuated. The operative pleading in the Civil Rights Action – the amended complaint[5] -- chiefly asserted claims under 42 U.S.C. §1983 against various officials employed by the Pennsylvania Gaming Commission for alleged violations of the plaintiffs' federal constitutional rights. *See Arneault v. O'Toole*, 1:11-cv-95-SJM (W.D. Pa.) Amended Complaint [50]. We

---

[4] *American Int'l Group Europe S.A. (Italy) v. Franco Vago Int'l, Inc.* 756 F. Supp. 2d 369 (S.D.N.Y. 2010) involved extenuating circumstances not present here – namely, the defendant's failure to assert the forum selection clause during the first eleven months of litigation and its attempt to assert the forum selection clause against a shipper and its subrogee who were not bound by the bill of lading containing the clause. Similarly distinguishable is *In re Rationis Enterprises, Inc. of Panama*, No. 97 CV 9052(RO), 1999 WL 6364 (S.D.N.Y. Jan. 7, 1999), wherein the court declined to enforce a forum selection clause largely because of the complexity and scope of the litigation. *See id.* at *3 ("Unjustifiably giving effect to all of the various forum clauses in a cargo situation of this complexity and global magnitude would fragment this case beyond recognition.") Thus, I do not view these decisions as providing meaningful support for the doctrine of waiver in the case at bar.

[5] By Memorandum Opinion and Order entered on March 28, 2012 [84], I dismissed Arneault's federal claims in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for reasons having nothing to do with the merits of this action. Arneault's state law claims were dismissed without prejudice to be asserted in state court. *See Arneault v. O'Toole,* --- F.Supp.2d ----, 2012 WL 1038814 (W.D. Pa. March 28, 2012).

previously summarized the basis of Arneault's complaints against the government officials thus:

> Arneault's primary complaint against the Government Defendants, however, concerns various actions taken by the [Pennsylvania Gaming Commission Board] and the [Bureau of Investigation and Enforcement] Defendants in connection with Arneault's attempt to renew his gaming license. As of April 2008, Arneault was still serving as CEO of MTR and Chairman of its Board of Directors. Accordingly, on April 21, 2008, he filed an application to renew his Category 1 Gaming License as an officer, director and principal shareholder of MTR— a license which had originally been approved by the PGCB on June 10, 2007. (AC ¶¶ 171–73.)

> As of October 31, 2008, however, Arneault had voluntarily retired as an officer, director or employee of MTR. He continued to serve as a consultant to MTR from November 1, 2008 until February 17, 2010 (AC ¶¶ 174–75), but by March of 2010, Arneault was no longer serving as a consultant to MTR and his stock ownership in the Company had fallen to less than 5 percent of MTR's total outstanding shares. ( Id. at ¶ 175.)

> Nevertheless, the PGCB continued to treat Arneault as a "principal" of PIDI with respect to licensing matters. After PIDI had filed an application to renew its gaming license on December 29, 2008, the PGCB continued to require that Arneault also maintain his license as a "principal" of PIDI. (AC ¶¶ 173, 176, 288.)

> Meanwhile, after Arneault had filed his application for license renewal in April of 2008, the Western Regional Office of the BIE ("BIE–West") prepared a Report of Investigation ("ROI") dated May 21, 2008 in which, Plaintiffs claim, BIE–West "intentionally and improperly found falsehoods to contest the suitability of Mr. Arneault to be renewed for licensure and to recommend the denial of Mr. Arneault's Principal license renewal." (AC ¶ 178.)

> One of these alleged falsehoods involved the accusation that Arneault had provided false and misleading information to the BIE concerning Charlie Sack, a Las Vegas gaming executive who had had prior legitimate business dealings with both MTR and Tecnica. (AC ¶¶ 182–84, 186.) Plaintiffs claim that, after their business relationships with Sack ended, Sack began an "unrelenting campaign with the PGCB to get even" with Plaintiffs. (AC ¶ 185.) This resulted in Sack providing Brletic false information that MTR and PIDI had used Tecnica as a conduit to funnel illegal payments to Sack. (Id.) According to Plaintiffs, the BIE—and particularly Brletic—had information indicating that Sack lacked credibility and should not be relied upon as a witness, and Brletic also had received unverified information that Sack might have ties to organized crime. (AC ¶¶ 187–89.) Nevertheless, Plaintiffs claim, Sack and Brletic had an understanding whereby "Sack would tell the story about Arneault and Rubino that the PGCB wanted to hear, and Defendant Brletic would reciprocate by placing Sack in a high-profile executive position with another PGCB licensee ..." (AC ¶ 190.)

> Also contributing to these false allegations, Plaintiffs allege, was information unlawfully obtained and provided to the BIE agents by Defendant Ambrose. According to Plaintiffs, Ambrose came into possession of certain proprietary information that had been misappropriated from Tecnica and Rubino via a former employee. This included records from Tecnica and Rubino that accounted for legitimate payments to Sack as well as various legal

and contractual payments from MTR and PIDI to Tecnica for real estate development and management services rendered. (AC ¶¶ 192–93; see also id. at ¶¶ 94–117.)

Plaintiffs aver that, based upon various misrepresentations made by Sack, Ambrose, and others, and without any independent verification or consultation with Plaintiffs, BIE adopted the view that the payments from MTR to Tecnica were a sham intended to cover up a continuing illicit relationship between MTR and Sack and that Arneault had given perjured statements concerning these payments. (AC ¶ 194.) Plaintiffs insist there was no legitimate reason for the Government Defendants to question MTR's and Tecnica's respective relationships with Sack because: (i) Sack's relationship with those companies had expired prior to the enactment of the Pennsylvania Race Horse Development Act; (ii) Sack's relationship with MTR and Tecnica were legal and commercially reasonable in all respects; and (iii) Sack's relationships with MTR and Tecnica had previously been reviewed and approved by the Nevada Gaming Commission. (AC ¶ 195.)

Nonetheless, based upon the information contained in BIE–West's ROI, the PGCB's Office of Enforcement Counsel issued a notice of recommendation that Arneault's license renewal application be denied (the "Recommendation of Denial"). (AC ¶ 179.)  This Recommendation of Denial, dated January 22, 2010, declared that "the BIE background investigation revealed inaccuracies or inconsistencies between the statements [Arneault] made to investigators and the Board which called into question [his] character, honesty and integrity." (AC ¶ 180.)  The Recommendation of Denial indicated twelve "areas of concern" relative to Arneault's suitability for licensure. ( Id.)

Arneault subsequently requested a hearing on the Recommendation of Denial, and a hearing date was set for May 20, 2010. (AC ¶¶ 196, 213.)  …

***

Eventually, hearings on Arneault's appeal of the Recommendation of Denial were held on May 20, 21, 24, 25, and 26 of 2010. (AC ¶ 235.)  According to the Amended Complaint, Arneault demonstrated in the course of those hearings that certain BIE–West agents had intentionally failed to conduct a fair and impartial investigation of his suitability for licensure and, in fact, had conducted a biased and unfair investigation resulting in the unsupportable recommendation that Arneault be stripped of his gaming license. ( Id. at ¶ 236.) Plaintiffs aver that, during the course of the hearings, Chief Enforcement Counsel Pitre and "certain other Government defendants" concluded that BIE–West had intentionally and improperly targeted Arneault, principally through the Recommendation of Denial and reports authored by Brletic. (Id. at ¶ 237.)  Pitre thus sought to bring the licensing hearing to an immediate conclusion that would avoid publication of the BIE agents' wrongful conduct by initiating a settlement conference with Arneault's counsel and Defendants O'Toole and Sherman. (AC ¶ 238.)

***

Meanwhile, Plaintiffs contend, news of the January 22, 2010 Recommendation of Denial has been widely reported by various media outlets and distributed over the internet, causing damage to Arneault's reputation as well as lost business opportunities in the gaming industry. (AC ¶¶ 248–51.)

*See Arneault v. O'Toole,* --- F. Supp. 2d ---, 2012 WL 1038814 at *8-10 (W.D. Pa.  Mar. 28, 2012.)

Insofar as the MTR Defendants were concerned, we summarized the factual underpinnings of Arneault's claims as follows:

> … On or about February 1, 2010, Arneault's attorney in the licensing matter contacted Defendant Rodriguez-Cayro and requested that MTR provide him certain information related to the matters at issue in Arneault's appeal of the Recommendation of Denial. (AC ¶ 197.)
>
> Thereafter, Plaintiffs allege, and for a period of several months leading right up to the May 2010 licensing hearing, Defendant Rodriguez–Cayro delayed and stonewalled Arneault in his attempts to obtain documents and depositions of MTR employees that were relevant to his licensing hearing. (AC ¶¶ 198–221.)  To the extent Rodriguez–Cayro did provide documentation to Arneault's counsel, he made clear that copies would also be shared with the opposing counsel at the OEC. (AC ¶ 204.)  Plaintiffs claim that Arneault ultimately had to obtain the vast majority of relevant documentation from Rubino and his companies at great effort and expense to Arneault. ( Id. at ¶¶ 222–27, 230–34.)  They further assert that most, if not all, of the documents provided by Tecnica and Rubino were in the care, custody, and control of MTR/PIDI and Defendants Griffin, Hughes, Bittner, Azzarello, Rodriguez–Cayro, and MTR's legal counsel, but these documents were intentionally withheld from Arneault. ( Id. at ¶ 228.)

Arneault v. O'Toole, supra, at *10.  As for the motives of the MTR Defendants in allegedly conspiring with the Defendant gaming officials, we summarized Arneault's theory this way:

> … In broad brush, Plaintiffs aver that Arneault had a falling out with MTR as a result of several developments. One factor, they allege, was the effort of Defendants Hughes (MTR's Chief Financial Officer) and Defendant Azzarello (MTR's Human Resource Director) to purge MTR employees that were perceived as being loyal to Arneault following his departure from the company.  (AC ¶¶ 254–55.)  Another factor, Plaintiffs claim, was the cumulative effect of Defendant Ambrose's campaign against Arneault and Rubino, which stemmed from collateral matters and which resulted in a "tectonic shift" in the way certain MTR Board members, attorneys, and PGCB staff members viewed Arneault.  ( Id. at ¶ 256.)  Plaintiffs claim that this shift in attitude on the part of MTR is demonstrated by the way the company failed to honor the terms of its deferred compensation agreement with Arneault. ( Id. at ¶¶ 257–61.)
>
> Plaintiffs also posit another motive for MTR's alleged conspiratorial activities: after rumors began to circulate sometime in 2009 that Arneault might be plotting a return to an active role in the company, Defendants Griffin, Hughes, Azzarello, and Rodriguez–Cayro became particularly motivated to prevent Arneault's return because they knew Arneault would not tolerate their practice of submitting incomplete and misleading financial disclosures to the

investing public and regulators.  ( Id. at ¶¶ 263–68.)  According to Plaintiffs, MTR has played "fast and loose" with its reporting obligations by failing to disclose that: (i) PIDI's gaming license renewal application has been pending for some 26 months and (ii) the license renewal application has been objected to by Rubino relative to the continued pendency of SOC 58 as a condition of PIDI's gaming license. ( Id. at ¶¶ 264–68, 269.)  In Plaintiffs' view, MTR's post-Arneault financial disclosures "cannot be properly stated unless there is a financial disclosure relating to the genuine risk that PIDI's gaming license may not be renewed" ( id. at ¶ 266 (footnote omitted)), yet the PGCB has tacitly condoned MTR's practices by failing to require the company to make these material disclosures.  (Id. at ¶ 269.)

Plaintiffs aver that various officers, attorneys, agents and employees of MTR and PIDI knew that they were in custody of documentation that would undermine the false claims made by Charles Sack and demonstrate the legitimacy of the monthly $13,000 fees MTR was to pay Tecnica under the consulting agreement entered into by those companies. (AC ¶¶ 275–83.) Nevertheless, Plaintiffs contend, these Defendants failed to produce these documents or otherwise support Arneault against the PGCB and BIE Defendants because they wanted to curry favor with and intentionally help the Government Defendants and at the same time prevent Arneault from returning to MTR and "clean[ing] house." (AC ¶ 284.)

Arneault v. O'Toole, supra, at *11-12.

Based on the foregoing allegations, Arneault asserted two separate causes of action against the MTR Defendants.  First, in Count 7 of the Amended Complaint, Arneault and Rubino asserted a joint claim against the MTR Defendants pursuant to 42 U.S.C. § 1983 under the theory that the MTR Defendants had conspired with the gaming official Defendants to violate the First Amendment and Fourteenth Amendment due process rights of Arneault and Rubino.  Insofar as Arneault was concerned, the basis of the claim was the MTR Defendants' alleged failure to make requested discovery available to Arneault during the run-up to Arneault's May 2010 hearings relative to the appeal of the BIE's Recommendation of Denial on his gaming license.

Because this particular claim sounded in federal tort law, it cannot be said to have arisen out of the Settlement Agreement.  Moreover there is no doubt that venue was properly laid in this Court, since MTR and PIDI were both subject to personal jurisdiction here and since many of the acts giving rise to the plaintiffs' claims were

alleged to have occurred within this district. Furthermore, the U.S. District Court of the Western District of Pennsylvania has a stronger interest than the state courts of West Virginia would have had in vindicating the alleged violations of federal civil rights occurring within this district. Thus, there is no basis for concluding that Arneault's federal civil rights claim against MTR should have been brought in Hancock County, West Virginia.

MTR makes much of the fact that Arneault appended the Settlement Agreement to the Amended Complaint and referenced it in his allegations, even to the point of quoting a provision ostensibly imposing upon MTR a duty to "permit Arneault access to non-privileged, non-confidential documents and information that he may reasonably require in defense of any claim asserted by State Bodies, Law Enforcement Agencies and Administrative Agencies, and/or required for any state gaming licensure." (Amended Complaint ¶ 262.) At most, this allegation served only to show that MTR potentially had a duty under state law to produce the requested documents but, even so, such an averment was not material to Arneault's §1983 conspiracy claim,[6] and therefore it did not create any dispute that could be said to "arise from" the Settlement Agreement. This is particularly true given Arneault's assertion that the MTR

---

[6] To successfully assert a claim of civil conspiracy under § 1983, the plaintiff must establish "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Jones v. Dalton,* --- F. Supp. 2d ---, 2012 WL 1134895 at *9 (D.N.J. April 3, 2012) (quoting *Adams v. Teamsters,* 214 Fed. Appx. 167, 172 (3d Cir.2007)). Here, the "overt act" committed by the MTR Defendants was presumably the withholding of requested discovery; however, there is no requirement for §1983 purposes that the "overt act" be an illegal one. Rather, the unlawfulness arises from the conspirators' agreement to violate the federal rights of the plaintiff. Therefore, even if the MTR Defendants had no actual obligation pursuant to the Settlement Agreement to produce the requested discovery, Arneault could still assert that their alleged stonewalling was an overt act that furthered their agreement with the Defendant gaming officials to deprive Arneault of his federal civil rights.

Defendants' duty to produce the requested discovery arose from alternative sources separate and apart from the Settlement Agreement – namely, (i) Arneault's status as a licensee of the Pennsylvania Gaming Commission Board whose renewal application was being processed on behalf of PIDI's own Category 1 license and/or (ii) the corporate officers' fiduciary obligations to MTR's shareholders.  (*See* Arneault v. O'Toole, Amended Complaint ¶ 421.)

Arneault's second cause of action against the MTR Defendants in the Civil Rights Action involved claims under Pennsylvania law for unjust enrichment and promissory estoppel as set forth at Count 8 of the Amended Complaint.[7]  Once again, the underpinnings of these claims concerned Arneault's efforts, allegedly at great personal expense, to pursue the renewal of his own gaming license, which in turn involved protracted proceedings to contest the BIE's Recommendation of Denial.  The theory is that Arneault undertook these efforts for the purpose of assisting PIDI maintain its own Category 1 gaming license, inasmuch as the renewal of Arneault's gaming license was deemed a prerequisite to the renewal of PIDI's license.  According to the Amended Complaint, Arneault's considerable efforts resulted in him incurring some $2,000,000 worth of legal and professional fees – all at his own personal expense.  Arneault did not allege, as part of his Count 8 claims, that the MTR Defendants possessed (or breached) a contractual duty to assist him in the pursuit of his license renewal and/or reimburse him for the costs incurred along the way.  Rather, Arneault averred that he

> incurred these expenses in reliance upon Defendant MTR's custom,
> practice and prior precedence of reimbursing him and/or paying directly for

---

[7] The claim for promissory estoppel was withdrawn prior to the Court's adjudication of the Defendants' Rule 12(b)(6) motions.

all legal and professional expenses and fees incurred as a result of, or required by, any licensing authority or any regulatory body. This custom, practice and precedence set by Defendant MTR was applied to Mr. Arneault every time he was required to be licenses or to have his license renewed as a result of his relationship with Defendant MTR. Mr. Arneault's reliance was reasonable under the circumstances and the result of that reliance has been to his detriment.

(Amended Complaint ¶ 435.)

As Arneault points out, under Pennsylvania law the doctrine of unjust enrichment is a quasi-contractual doctrine which has no application if a written agreement or express contract exists between the parties. *See Ruby v. Abington Memorial Hospital,* --- A.3d ---, 2012 WL 1940570 at *7 (Pa. Super. May 30, 2012). Similarly, claims for promissory estoppel cannot proceed where an express contract is present. *See Carlson v. Arnot-Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir. 1990); *Synesiou v. DesignToMarket, Inc.*, No. 01-5358, 2002 WL 501494 at *4 (E.D. Pa. April 3, 2002). Thus, as a matter of Pennsylvania law, Arneault could not have been suing upon the Settlement Agreement in asserting his Pennsylvania common law claims for unjust enrichment and promissory estoppel in Count 8. An examination of the Amended Complaint confirms that he was not.

The only other notable reference to the Settlement Agreement in the Amended Complaint concerns Arneault's anticipation that the MTR Defendants might argue that some or all of Arneault's claims in the Civil Rights Action would be barred by virtue of the release provision in the Settlement Agreement. Specifically, in a footnote to the Count 8 claims, it is acknowledged that Paragraph 3.1 of the Settlement Agreement contains a release of claims by Arneault against MTR. However, it is further alleged by Arneault that the release only covers claims that would have arisen "through and

including the Effective Date of this Agreement," meaning February 27, 2010. (See Amended Complaint [50] at ¶ 439, n. 40.) Thus, it was clearly Arneault's position that his unjust enrichment and promissory estoppel claims were not barred by the release provision in the Settlement Agreement, and he prophylactically averred as much.

I do not view this allegation as sufficient to support a finding that Arneault voluntarily waived his right to enforce the forum selection clause contained in the Settlement Agreement in the present civil action. Clearly, it was Arneault's position that none of his claims in the Civil Rights Action depended upon contractual rights embodied in the Settlement Agreement. On the contrary, Arneault has argued – and we agree – that the Settlement Agreement could only have had relevance in the Civil Rights Action as a potential (but likely non-meritorious) defense to the extent that the MTR Defendants might have argued that some or all of Arneault's claims in the Civil Rights Action were barred by the Settlement Agreement's release provision. Such a tangential connection between Arneault's federal lawsuit and the Settlement Agreement cannot support a finding of voluntary waiver.

This conclusion is further compelled by virtue of the Settlement Agreement's "Amendments" provision, which expressly limited the circumstances under which any of the contractual terms could be changed or waived. Specifically, Paragraph 4.1 states that: "[n]either this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated *except by a writing signed by the Parties*." (See Complaint Ex. 2 [1-3] at p. 8, ¶ 4.1 (emphasis supplied).) There is no allegation by MTR that Arneault has manifested an intent to abandon his rights under the forum selection clause through a written, signed acknowledgment as contemplated by Paragraph 4.1 of

the Agreement. Furthermore, none of the cases relied upon by MTR for the "waiver-by-conduct" principle addressed the effect of a waiver limitation clause such as the one at issue here.

Finally, I take judicial notice of a ruling entered on January 25, 2012 by the Honorable Arthur J. Recht of the Circuit Court of Hancock County, West Virginia, in which Judge Recht determined that MTR was in contempt of that court by virtue of having commenced this pending action in violation of the Settlement Agreement's forum selection clause.[8] *See Arneault v. MTR Gaming Group, Inc.,* Case No. 09-C-175 (Cir. Ct. Hancock Cty.) (Tr. of 1/25/12 Hrg., attached as Def.'s Addendum to Mot. to Dismiss [17-1] ). In the course of reaching his ruling, Judge Recht found that a "substantial portion" of MTR's complaint in the pending matter arises out of the Settlement Agreement. In the contempt proceeding, as here, MTR argued that Arneault was essentially estopped from arguing any violation of the Settlement Agreement's forum selection clause by virtue of having commenced the Civil Rights Action in this Court. Judge Recht rejected this argument, finding that "the suit filed by Mr. Arneault in the Western District of Pennsylvania does not grow out of the Settlement Agreement" and, moreover, "it's the only place where that suit could have been filed." (Tr. at p. 4.) As part of his contempt ruling, Judge Recht went on to impose a fine on MTR, to run every day until the Settlement Agreement-related claims are not withdrawn.

Arneault has argued that Judge Recht's ruling conclusively establishes that no waiver of the forum selection clause has occurred by virtue of Arneault's

---

[8] Upon settlement of the West Virginia Lawsuit, the Circuit Court of Hancock County apparently incorporated the Settlement Agreement into the Court's order of dismissal such that it retained jurisdiction over enforcement of the Settlement Agreement.

commencement of the Civil Rights Action in this Court. Although there is some dispute between the parties as to whether Judge Recht's ruling should be given preclusive effect, I find the argument to be academic because, having undertaken my own separate analysis, I find myself in agreement with Judge Recht on the two central points at issue here: (i) several of MTR's claims against Arneault arise out of the Settlement Agreement and are therefore subject to the Agreement's forum selection clause, and (ii) Arneault has not waived his contractual right to enforce the forum selection clause by virtue of having previously prosecuted the Civil Rights Action.

In sum, for all of the reasons previously discussed, I am not persuaded by MTR's central premise that Arneault's claims in the Civil Rights Action "arose from" the Settlement Agreement. Consequently, I do not consider Arneault's decision to commence the Civil Rights Action in this Court as being so inherently contradictory to the intent of Paragraph 4.4's forum selection clause as to manifest a clear intent on the part of Arneault to relinquish his rights under that provision.

Under the law of this circuit, as noted above, MTR must make a "strong showing" as to why the forum selection clause should not be given effect. Given the nature of Arneault's claims in the Civil Rights Action, the specific language concerning waiver in the Settlement Agreement, and the ruling of the West Virginia Circuit Court for Hancock County, I do not find that MTR has made this requisite showing. Accordingly, Paragraph 4.4 of the Settlement Agreement will be given effect.

Having concluded that the forum selection provision of Paragraph 4.4 remains valid and enforceable, I must address one remaining point of contention. The provision, by its terms, applies as to "[a]ny dispute arising from [the Settlement Agreement]."

Arneault contends that this language implicates Counts 1, 2, 4 and 5 of the complaint.

MTR agrees that at least Counts 2, 4, and 5 are governed by the Settlement Agreement

and thereby subject to the forum selection provision. Although Judge Recht felt that

Counts 2, 4 and 5 clearly arise out of the Settlement Agreement, he indicated that he

less sure about Count 1; however, Judge Recht never expressly ruled upon that point

because, for purposes of his contempt ruling, he had no need to do so.

Upon consideration of this issue, I find that Count 1 of the complaint also arises

out of the Settlement Agreement and is therefore subject to the forum selection clause.

The pertinent provision of the Settlement Agreement is Paragraph 2.3, which reads:

> 2.3 **Obligations Under the Consulting Agreement.** Arneault
> and MTR continue to have various obligations to one another under the
> Consulting Agreement. On the Effective Date of this Agreement, each
> and every one of those obligations shall be waived and released by the
> Parties with the exception of the non-compete provision in Paragraph 8 of
> the Consulting Agreement (the "Non-compete") and the non-solicitation
> provision in Paragraph 9 of the Consulting Agreement (the "Non-
> solicitation") a copy of which is attached and incorporated. The Non-
> compete shall remain in full force and effect but the geographic limitations
> will be reduced to 100 miles and the time limitation shall continue to be in
> effect until April 30, 2011.

(Complaint Ex. 2 [1-3] at ¶ 2.3.) MTR has alleged that, by virtue of this language,

Paragraph 8 of the Consulting Agreement remains in effect (as modified) and moreover,

through his involvement with AHT, Arneault has breached this contractual obligation.

(Complaint ¶¶ 10-21 and Ex. 1 [1-2] and 2 [1-3].)

Given the fact that the Settlement Agreement: (a) expressly modifies a term of

the Consulting Agreement Non-complete Clause, (b) includes the Consulting

Agreement as an attachment, and (c) incorporates the Consulting Agreement by

reference, I conclude that the operative contractual non-compete rights at issue arise at least partially, if not entirely, out of the Settlement Agreement.  See 11 Richard A. Lord, WILLISTON ON CONTRACTS § 30:25 (4th ed.) ("When a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument. [ ]  The incorporated matter is to be interpreted as part of the writing. [ ]") (internal footnotes omitted) (citing authority).  Accordingly, since MTR's claim for alleged breach of the Non-compete provision "arises" out of the Settlement Agreement, it is subject to the forum selection clause found in Paragraph 4.4.

For the reasons stated herein, Counts 1, 2, 4, and 5 of the complaint will be dismissed so that they can be reasserted by MTR, if it chooses, in the Circuit Court of Hancock County, West Virginia.

B. <u>Arneault's Motion to Dismiss Based Upon Paragraphs 3.1 and 3.2 of the Settlement Agreement</u>

As an alternative basis for dismissal, Arneault has argued that all of the counts in the complaint are barred by virtue of two release provisions contained in the Settlement Agreement and Release.  Since Counts 1, 2, 4, and 5 will be dismissed on the basis of the forum selection clause, I need not address them presently.  Instead, I will consider this alternative basis for dismissal only as it relates to the claims remaining at Counts 3 and 6.[9]

---

[9] To the extent the parties dispute the meaning, intent, or scope of the release provisions in the Settlement Agreement, this would appear to present a "dispute arising from" the Settlement Agreement and subject to the forum selection provision.  However, Arneault has expressly sought to enforce the forum selection clause only with respect to Counts 1, 2, 4 and 5.  He has not asserted the defense of improper forum insofar as Counts 3 and 6 are concerned.  We will therefore assume that Arneault's

The two release provisions in the Settlement Agreement state as follows:

**3.1 <u>Release by Arneault.</u>** In consideration of the Payments, Arneault releases, acquits and forever discharges, and covenants not to sue, the MTR Defendants and each of their past and present employees, directors, officers, agents, consultants, accountants, attorneys, insurers, representatives, stockholders, owners, parents, subsidiaries, affiliates, predecessors, successors and assigns (collectively referred to as the "Released Parties") from any and all claims, losses, liabilities, damages, penalties, fines, judgments, taxes, costs, fees, expenses (including without limitation attorneys' fees) of any kind, known or unknown, **which Arneault now has or may have against the Released Parties through and including the Effective Date of this Agreement.** Such released claims include, but are not limited to, any and all claims of breach of express or implied contract, promissory estoppel and all other equitable claims, wrongful discharge and all other common law claims, employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act of 1990, the Equal Pay Act of 1963, the Older Workers Benefit Protection Act of 1990, the Civil Rights Act of 1866, the Family and Medical Leave Act of 1993, the Civil Rights Act of 1991, the Employee Retirement Income Security Act of 1974, and all other federal, state, local, or municipal laws, rules or regulations, including all claims arising out of, based upon or related to Arneault's employment and consulting relationship with MTR and the termination of that employment and consulting relationship, and all claims for punitive or compensatory damages, costs or attorneys' fees. The released claims specifically include all such rights under the West Virginia Human Rights Act and the Age Discrimination in Employment Act, as amended, 29 U.S.C. 621 et seq. ("ADEA").

**3.2 <u>Release by MTR Defendants</u>**. Except as set forth in Section 2.3 of the Agreement, the MTR Defendants shall release and forever discharge Arneault from any and all claims, losses, liabilities, damages, penalties, fines, judgments, taxes, costs, fees, expenses (including without limitation attorneys' fees) and obligations, actual or alleged or known or unknown, including those which relate to the Lawsuit, the Employment Agreement, the DCA and, with the

willingness to have this Court adjudicate the meaning and scope of the Release Provisions relative to Counts 3 and 6 of the complaint -- unlike his conduct in filing the Civil Rights Action – constitutes an intentional, if limited, waiver of the forum selection clause. No waiver will be inferred insofar as Counts 1, 2, 4 and 5 are concerned because Arneault's primary argument as to those counts is improper venue; his substantive challenges to Counts 1, 2, 4 and 5, including his argument premised upon the release language, have been presented merely as secondary, alternative bases for dismissal.

exceptions contained in this Agreement, all claims under the
Consulting Agreement.

(Complaint Ex. 2 [1-3] at ¶¶ 3.1 and 3.2 (emphasis added).)

Comparing these two provisions, Arneault observes that the release set forth in

¶3.1 contains a temporal limitation (i.e. referring to claims which "Arneault now has or

may have against the Released Parties through and including the Effective Date of this

Agreement"), whereas the release set forth in ¶ 3.2 does not.  Arneault reasons that this

discrepancy should be construed as a purposeful reflection of the parties' intent to

release Arneault from claims existing on the effective date of the agreement **as well as

from related claims that might arise in the future.**  Applying this logic, Arneault

concludes that all of the claims in MTR's complaint are facially barred and must be

dismissed.

MTR counters that such a construction is unreasonable in that it would bar any

claim for breach of the Settlement Agreement itself, rendering the Agreement (or at

least several of its provisions) meaningless.  In addition, citing Pennsylvania cases,

MTR contends that, as a legal matter, a release can only apply to claims that existed as

of the time of its creation.

Notably, the Settlement Agreement expressly provides that "[a]ny disputes

arising from this agreement shall be interpreted pursuant to the laws of West Virginia."

(Complaint Ex. 2 [1-3] at ¶ 4.4.)  Accordingly, any analysis premised upon interpretation

of the Settlement Agreement must begin with an analysis of the relevant choice-of-law

principles.

As a federal district court exercising diversity-of-citizenship jurisdiction, we apply the conflict-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Bayer Chemicals Corp. v. Albermarle Corp.*, 171 Fed. Appx. 392, 398 (3d Cir. 2006). Our Circuit Court of Appeals has observed that "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir.1994) (citing *Smith v. Commonwealth Nat. Bank*, 557 A.2d 775, 777 (Pa. Super. 1989)). *See also Gay v. CreditInform,* 511 F.3d 369, 389 (3d Cir. 2007). In particular, Pennsylvania courts have adopted section 187 of the Restatement (Second) Conflict of Laws, which provides that choice-of-law provisions will be enforced:

> unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue....

*See Kruzits*, 40 F.3d at 55.

Here, neither party seriously disputes that the Settlement Agreement's choice-of-law provision should apply for purposes of construing the intent and meaning of the Settlement Agreement provisions.[10] I likewise find that the choice-of-law provision contained in Paragraph 4.4 of the Settlement Agreement should be given effect. It is clear that West Virginia has a substantial relationship to the subject matter of the Settlement Agreement and at least one of the parties to it. Specifically, the Settlement Agreement was executed in large measure in order to resolve various state law claims

---

[10] As we previously discussed in some detail, *supra*, the parties' only dispute along these lines is whether the Settlement Agreement's forum selection clause should be enforced relative to Counts 1, 2, 4 and 5.

which Arneault had asserted against MTR and others in West Virginia state court.  (See Complaint Ex. 2 [1-3] at "Recitals.")  One of the named defendants in the West Virginia litigation was Mountaineer Park, Inc., a West Virginia corporation, and the agreement was at least partially executed in West Virginia.  Arneault expressly acknowledged in the Settlement Agreement that he had consulted with West Virginia counsel prior to signing the Agreement.  (Id. at ¶ 3.4.)  Moreover, the Settlement Agreement incorporated certain provisions of the Consulting Agreement and purported to resolve any potential claims thereunder; the Consulting Agreement, like the Settlement Agreement, also contained a choice-of-law provision invoking West Virginia law.  (See Complaint Ex. 1 [1-2] at ¶ 13(d).)  Neither party to the pending litigation has asserted that application of West Virginia law (insofar as it involves construing the release provisions) would contravene a fundamental policy of another state with a materially greater interest in the particular issue raised here.  Accordingly, I will assume for present purposes that West Virginia law governs the construction of the Settlement Agreement's terms and conditions.

In general, West Virginia law favors the enforcement of release provisions when they are part of a settlement agreement.  *See West v. Liberty Mutual Ins. Co.*, No. 93-2457, 1994 WL 399140 at *2 (4th Cir.  Aug. 3, 1994) ("The law favors and encourages the resolution of controversies by contract of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy.") (*quoting Acord v. Chrysler Corp.*, 399 S.E. 2d 860 (W. Va. 1990) (Syllabus Point 1)).

Nevertheless, under West Virginia law, a release "ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of its execution." *Hagy v. Equitable Production Co.*, Civil Action No. 2:10-cv-1372, 2012 WL 1806167 at *2 (S.D.W.Va. May 17, 2012) (quoting *Murphy v. N. Am. River Runners, Inc.*, 186 W.Va. 310, 316–17, 412 S.E.2d 504 (1991) (internal quotations omitted)). As is always the case with matters of contract interpretation, discerning the intent of the parties is paramount and, where the document in question is unambiguous, intent is to be gleaned from the document's language. *See Bischoff v. Francesa*, 56 S.E. 2d 865, 870 (W.Va. 1949) ("The polestar for the construction of a contract is the intention of the contracting parties as expressed by them in the words they have used.") (citation omitted). *See also Bernstein v. Kapneck*, 430 A.2d 602, 606 (Md. 1981) ("[B]ecause releases are contracts, conventional rules of construction dictate that when the scope of the agreement is stated in clear and unambiguous language, the words utilized to express this breadth should be given their ordinary meaning…") (cited with approval in *West* , *supra*, at *3, construing West Virginia law).

Applying the foregoing principles in light of the language of the Settlement Agreement, I conclude that MTR's sixth cause of action for alleged violation of the Pennsylvania Trade Secrets Act was within the scope of claims contemplated by the parties at the time they executed the release provisions. Notably, the Settlement Agreement makes clear that MTR was aware of and concerned about the possibility that Arneault might engage in the unauthorized disclosure of its trade secrets at some point in the future. Thus, Paragraph 2.5 of the Settlement Agreement expressly creates a contractual obligation on the part of Arneault to:

> not divulge to any other person or entity any confidential or proprietary information of MTR which is not generally known in the marketplace, including, without limitation, processes, procedures, software and technology, financial information, strategic planning, sales, advertising and marketing plans and strategies, employee compensation plans, customer lists and information, vendor contracts and other arrangements and contracts of MTR, *or any and all other trade secrets of MTR*.

(Complaint Ex. 2 at ¶ 2.5 (emphasis added).)  Similarly, ¶ 2.6 imposes an obligation upon Arneault to return to MTR any items already in his possession that "contain[ ] confidential, proprietary or trade secret information of MTR."  (Id. at ¶ 2.6.) Paragraph 3.7 expressly reserves to MTR the right to enforce this contractual obligation, notwithstanding the release provision.  (See *id.* at ¶ 3.7, stating, "The releases set forth above are not intended to discharge any rights, privileges, benefits, duties or obligations imposed upon any of the Parties by reason of, or otherwise arising under, this Agreement.")

In creating this contractual remedy, the parties mutually acknowledged MTR's interest in preserving its confidential trade secrets from unauthorized divulgence on the part of Arneault in the future.  Further, the parties expressly empowered MTR to protect against this contingency, but only insofar as MTR could enforce its contractual rights under the Settlement Agreement.  Importantly, the reservation-of-rights clause in the Settlement Agreement applies only to "rights, privileges, benefits, duties or obligations *imposed upon any of the Parties by reason of, or otherwise arising under, this Agreement."*  (Complaint Ex. 2 at ¶ 3.7 (emphasis added).)  Because this reservation-of-rights provision expressly preserves only contractual remedies arising under the Settlement Agreement and omits any mention of rights arising under statutory or

common law tort principles, and in light of the otherwise broad language of the release language, we may infer that the release provision was intended to cover the type of tortious trade secret violations contained in Count 6. This inference is especially warranted given the parties' express acknowledgement in the Settlement Agreement that they were represented by counsel during the negotiations process and entered into the Agreement with full awareness of its terms. *See West, supra,* at *2 (upholding general release provision which was clear and unambiguous where, among other things, the plaintiffs against whom the provision was being raised were represented by counsel during the negotiation of the settlement and were apparently aware of and consented to the release language). *Accord Grant County Sav. & Loan Ass'n v. RTC*, 968 F.2d 722, 724-25 (8th Cir. 1992) (cited in *Grant, supra,* for the proposition that "court of appeals will assume parties were fully aware of the terms and scope of their agreement when they have negotiated the release with the assistance of counsel and agreed to the language").

We reach a different conclusion, however, with respect to Count 3. MTR's third cause of action asserts a claim for tortious interference with a contractual relationship based upon Arneault's alleged involvement in soliciting and inducing Rubino to join as a plaintiff in the Civil Rights Action. MTR claims that, in doing so, Arneault encouraged Rubino to repudiate a former buy-out agreement which Rubino had entered into with MTR and PIDI on behalf of Technica. The relevant allegations are as follows:

> 44. During his tenure as CEO of MTR, Arneault built a relationship with Rubino, which included causing MTR to enter into a consulting agreement with Rubino's company, Tecnica, under which Tecnica was to be paid substantial monthly payments plus a contingency of 3% of the hoped-for profits over time from the PIDI racetrack/casino in Erie, Pennsylvania.

45.  In late September or early October, 2006, Arneault, as CEO for MTR, arranged for a "buy-out" of Rubino/Tecnica's consulting agreement.

46.  On or about October 23, 2006, MTR entered into a "buy-out" agreement with Rubino/Tecnica, by which they terminated the consulting agreement.  In doing so, MTR paid Rubino (through Tecnica) accelerated guaranteed lump sums totaling $4.2 million, in full satisfaction of the obligations MTR and PIDI may have previously owed to Rubino/Tecnica.[ ]

47.  In early 2011, Arneault solicited and induced Rubino to join him in pursuing the federal lawsuit in the United States District Court for the Western District of Pennsylvania against MTR, PIDI and certain Pennsylvania Gaming Control Board officials.

48.  Arneault, through wrongful means including breach of his own obligations to MTR, induced Rubino/Tecnica to breach the contract with MTR by bringing claims for compensation that Rubino/Tecnica had expressly waived and compromised in the October 2006 "buy-out" agreement with MTR.

49.  Among other things, Arneault provided information and direct and active support facilitating, encouraging, aiding and abetting Rubino/Tecnica to breach the contract and assert such claims against MTR.  This included Arneault joining Rubino/Tecnica in a lawsuit against MTR, and Arneault providing Rubino/Tecnica and their counsel information and assistance for bringing the federal court action, and Arneault's making the allegations set forth in the federal court Complaint and Amended Complaint.

50.  Rubino/Tecnica filed the related federal court action in order to obtain money from MTR which Rubino/Tecnica claims would have been owed had Rubino/Tecnica not entered into the 2006 "buy-out" agreement.

51.  Arneault's unlawful interference with the contractual agreement between Rubino/Tecnica and MTR is actionable under Pennsylvania law, and was without privilege or justification.

52.  As a result of Arneault's unlawful interference, MTR has suffered and will continue to suffer harm, including pecuniary loss of its contractual benefit with Rubino/Tecnica, as well as fees and costs being incurred in responding to the related federal action.

53.  Arneault's misconduct is willful, wanton and outrageous, warranting punitive damages. …

(Complaint ¶¶ 44-53.)

As the foregoing allegations reveal, the buy-out agreement with which Arneault allegedly interfered was entered into in October of 2006.  The alleged interference did not occur until January of 2011, however – more than four years later and some fourteen months after Arneault and MTR signed their Settlement Agreement.  The timing of these events suggests that the tortious interference claim asserted in Count 3 was not the type of claim within the contemplation of the parties at the time they

executed the Settlement Agreement. Therefore, the release provision of the Settlement Agreement will not preclude that particular claim. For the reasons already discussed, only MTR's claim for alleged violations of Pennsylvania's Trade Secrets Act is barred by the release provision, and that claim will be dismissed accordingly.

C. Arneault's Rule 12(b)(6) Challenge to Count 3

Since our analysis to this point leaves only the claim at Count 3 remaining, we must address Arneault's substantive challenge to that claim. Specifically, Arneault moves to dismiss Count 3 pursuant to Rule 12(b)(6) on the grounds that MTR's complaint fails to allege either the breach of any contract or the requisite tortious intent.

Under Pennsylvania law, the following elements are required in order to make out a claim for intentional interference with an existing contractual relation:

(1) the existence of a contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania,* 7 A.3d 278, 288-89 (Pa. Super. 2010) (*quoting Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997) (internal footnote omitted)).

In determining whether a particular course of conduct gives rise to a claim for intentional interference with contractual relations, Pennsylvania courts follow Section

767 of the Restatement (Second) of Torts. Section 767 provides the following factors for consideration: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties. *Ira G. Steffy & Son, Inc., supra,* at 288-89 (*quoting Strickland,* 700 A.2d at 985).

In consideration of the foregoing, and based on the allegations set forth in the complaint as well as information gleaned from other appropriate Rule 12(b)(6) materials,[11] I find that MTR has pleaded a viable claim for tortious interference with a contractual relationship. MTR has satisfied the first element by pointing to the October 2006 buy-out agreement as the relevant contractual relation with third party Tecnica. Further, MTR has alleged purposeful (i.e, "willful" misconduct on the part of Arneault with the specific intention to harm that contractual relation.

Arneault contends that no "breach of contract" has been alleged, but this Court disagrees. A review of the buy-out agreement reveals that MTR and Tecnica expressly agreed that the $4.2 million payment to Rubino (via Tecnica) would constitute an accord and satisfaction of any right Rubino or Tecnica had to further compensation under Tecnica's former consulting agreement with MTR and PIDI. To the extent MTR alleges that Arneault was complicit in soliciting Rubino to assert an unjust enrichment and/or promissory estoppel claim against MTR in the Civil Rights Action, MTR has satisfactorily alleged conduct on the part of Arneault meant to upset the parties' settled expectations

---

[11] Because the referenced "buy-out agreement" between Tecnica and MTR is integral to Count 3, and because this same agreement was appended as an exhibit to Arneault's complaint in the Civil Rights Action, this Court will take judicial notice of the agreement, including its terms and conditions. See Arneault v. O'Toole, Case No. 1:11-cv-95-SJM, Amended Complaint Exhibit 1 [50].

with regard to the $4.2 million payout to Tecnica. That is because the unjust enrichment and promissory estoppel claims at issue in the Civil Rights Action sought to secure for Rubino and Passport Realty (Tecnica's successor company) additional payments for services rendered under Tecnica's former consulting agreement with MTR and PIDI in direct contravention of the terms of the buy-out agreement. Were Rubino to be successful on his unjust enrichment and/or promissory estoppel claims, the recovery would disrupt MTR's expectations relative to the terms of the buy-out agreement.[12]

Turning to the remaining elements of a tortious interference claim, I note MTR's allegation that Arneault acted without privilege or justification, which satisfies element three. Finally, MTR has adequately alleged actual legal damage as a result of Arneault's conduct, insofar as MTR has incurred counsel fees and/or other expenses in defending the unjust enrichment and promissory estoppel claims.

Because MTR's claims are sufficient under federal notice pleading standards to state a viable claim for tortious interference with a contractual relationship, Count 3 of the complaint will not be dismissed.

## IV.    CONCLUSION

For all of the foregoing reasons, Arneault's motion to dismiss the complaint pursuant to Rules 12(b)(3) and/or 12(b)(6) of the Federal Rules of Civil Procedure will be granted in part and denied in part. With respect to Counts 1, 2, 4 and 5 of the complaint, the motion will be granted and those claims will be dismissed pursuant to Rule 12(b)(6) rather than Rule 12(b)(3). However, the dismissal shall be without

---

[12] Not surprisingly, in the Civil Rights Action, MTR brought a motion to dismiss the unjust enrichment and promissory estoppel claims premised partly on the argument that the buy-out agreement constituted a release and/or satisfaction of those claims.

prejudice to MTR's right to reassert those claims in the Circuit Court of Hancock County, West Virginia. Arneault's motion will further be granted as to Count 6 of the complaint, and MTR's claim for alleged violations of Pennsylvania's Trade Secrets Act will be dismissed with prejudice as barred by the release provision of the Settlement Agreement.[13] Finally, Arneault's motion will be denied insofar as it relates to Count 3, as MTR has alleged a viable claim for the intentional interference with a contractual relation. An appropriate order follows.

---

[13] For present purposes we need not, and do not, express any opinion as to whether MTR could successfully assert in the Circuit Court for Hancock County a claim for alleged breach of Arneault's contractual duty not to divulge MTR's trade secrets.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MTR GAMING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-208-SJM |
| | ) | |
| v. | ) | |
| | ) | |
| EDSON R. ARNEAULT, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

AND NOW, to wit, this 27th Day of September, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Motion to Dismiss [11] filed by Defendant Edson R. Arneault shall be, and hereby is, GRANTED in part and DENIED in part, as follows:

1. Said motion is GRANTED as to Counts 1, 2, 4, and 5 of the Complaint and, accordingly, those counts shall be, and hereby are, DISMISSED without prejudice;

2. Said motion is GRANTED as to Count 6 of the Complaint and, accordingly, that count shall be, and hereby is, DISMISSED with prejudice; and

3. Said motion is DENIED as to Count 3 of the Complaint.

IT IS SO ORDERED.

s/    Sean J. McLaughlin

SEAN J. McLAUGHLIN
United States District Judge

Cm:    All counsel of record.