**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MTR GAMING GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:11-cv-208-SPB** |
| **v.** | ) | |
| | ) | |
| **EDSON R. ARNEAULT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]

**M.J. Susan Paradise Baxter**

This civil action arises from a long-standing dispute between Plaintiff MTR Gaming

Group, Inc. ("MTR") and Defendant Edson R. Arneault ("Arneault"), the company's former

CEO, major shareholder, and consultant, which has engendered a series of lawsuits in both

federal and state court. In this case, MTR alleges that Arneault tortiously interfered with a

particular contractual relationship, and Arneault counters with allegations that MTR has defamed

him and abused the legal process in connection with this lawsuit. As the parties are diverse and

the matter in controversy exceeds $75,000 exclusive of interests and costs, the court has

jurisdiction pursuant to 28 U.S.C. §1332.

Presently pending before the court is MTR's motion for judgment on the pleadings

relative to the counterclaims asserted by Arneault. For the reasons that follow, the motion will

be denied.

---

[1] In accordance with the provisions of 28 U.S.C. §636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.

## I. Procedural and Factual Background

MTR is a Delaware corporation engaged in the gaming business with a satellite office in Wexford, Pennsylvania. Among the gaming businesses which MTR owns and operates is Presque Isle Downs & Casino ("PIDI"), a racetrack and casino located in Erie, Pennsylvania. (Compl. ¶ 1, ECF No. 1; Answer ¶1, ECF No. 24.) Defendant Edson R. Arneault is a resident of Florida and a shareholder of MTR. (Compl. ¶2; Answer ¶2.) Between 1995 and 2008, Arneault served as CEO of MTR and Chairman of its Board of Directors; he was also a significant shareholder of the company. (Compl. ¶ 7; Answer ¶ 7.)

At some point in 2008, Arneault advised MTR's Board that he did not intend to continue as CEO upon the expiration of his employment contract at the end of that year. (Compl. ¶ 9; Answer ¶ 9.) Upon stepping down as CEO, Arneault became a consultant to MTR pursuant to a consulting agreement dated October 15, 2008 (hereinafter referred to as the "Consulting Agreement"). (Compl. at ¶ 10; Answer ¶ 10.) Paragraph 8 of the Consulting Agreement contained a non-compete clause which placed certain restrictions on Arneault's participation in the gaming business for a period of thirty months, or until April 30, 2011. (Compl. Ex. 1 ¶8, ECF No. 1-2.) At some point, Arneault and MTR also entered into a deferred compensation agreement (the "Deferred Compensation Agreement"). (*See* Compl. Ex. 2 at p. 1, ECF No. 1-3.)

### A. The West Virginia Lawsuit

Disputes later arose between MTR and Arneault concerning the terms of the Deferred Compensation Agreement. This resulted in Arneault filing a lawsuit against MTR in the Circuit Court of Hancock County, West Virginia (the "West Virginia Lawsuit"). (Complaint Ex. 2 at p. 1, ECF No. 1-3.) In February 2010, the parties entered into a settlement agreement and release of claims (hereinafter, referred to as the "Settlement Agreement"), through which MTR and

Arneault purported to "finally and completely … resolve, compromise and settle and any all claims related to the West Virginia Lawsuit, the [Deferred Compensation Agreement] and, with the exceptions contained in this [Settlement] Agreement, all claims under the Consulting Agreement." (*Id.*)   Under the terms of the Settlement Agreement, Arneault was paid $1.6 million in full satisfaction of the claims and rights he had against MTR.  (*Id.*at ¶ 2.2.)  The Settlement Agreement also reduced the geographic scope of the non-compete provision set forth in the Consulting Agreement but otherwise kept that provision in effect until April 30, 2011.  (*Id.* at ¶ 2.3.)

B.  The Federal Civil Rights Lawsuit

On April 15, 2011, Arneault filed in this Court a civil case captioned *Arneault, et al. v. O'Toole, et al.*, Civil Action No. 1:11-cv-95 (W.D. Pa.) (hereinafter, the "Civil Rights Lawsuit"). The named defendants included MTR and several of its current and former executives and directors (collectively, the "MTR defendants"), as well as MTR's subsidiary PIDI and numerous public officials associated with the Pennsylvania Gaming Commission.  Arneault's co-plaintiff in the Civil Rights Lawsuit was Gregory Rubino, a commercial real estate agent and developer who is also President of Passport Realty, LLC and Passport Development, LLC, located in Erie County.  *See generally Arneault, v. O'Toole, supra*, Amended Compl. ¶¶ 2, 49-55, EFC No. 50. In the Civil Rights Lawsuit, Arneault and Rubino asserted federal claims against the MTR defendants for alleged conspiracy to violate their civil rights and state law claims against the MTR defendants for unjust enrichment and promissory estoppel.  (*See id*. at ¶¶ 417-50.)

Arneault's promissory estoppel claim against the MTR defendants was voluntarily dismissed on January 25, 2010.  *See Arneault v. O'Toole,* Civil Action No. 1:11-cv-95 (W.D. Pa) (Order Granting Mot. Partial Voluntary Dismissal Pursuant to Rule 41(a)(1), Jan. 25, 2010, ECF

No. 83).  His federal claims were dismissed with prejudice by the District Court in a

Memorandum Opinion and Order entered on March 28, 2012.  *See id*.  (Order Granting, in Part,

Def.s' Mot. to Dismiss Mar. 28, 2012, ECF No. 84).  In that same ruling, the District Court

dismissed the unjust enrichment claim without prejudice to Arneault's right to pursue that claim

in state court.  *See id.*  The District Court's order dismissing these claims was subsequently

affirmed by the Third Circuit Court of Appeals on February 7, 2013.  *Arneault v. O'Toole,* No.

12-1972 (3d Cir. Feb. 7, 2013) (Opinion Affirming Order Granting Mot. Dismiss) (filed at

*Arneault v. O'Toole,* Civil Action No. 1:11-cv-95 (W.D. Pa.), ECF No. 101-1).

C.  The Present Lawsuit

MTR commenced this civil action on September 16, 2011 based on Arneault's

prosecution of the Civil Rights Lawsuit and his involvement with an entity known as American

Harness Tracks, LLC ("AHT").  The case was originally assigned to United States District Judge

Sean J. McLaughlin.

1.  MTR's Complaint

MTR's complaint initially asserted six causes of action.  Count 1 alleged a claim for

breach of contract premised upon the theory that Arneault's involvement with AHT constituted a

violation of the aforementioned non-compete clause.   Count 2 asserted a claim for breach of

contract based on the theory that Arneault's prosecution of the Civil Rights Lawsuit constituted a

violation of a covenant not to sue that was set forth in the Settlement Agreement.  Count 3

asserted a claim for tortious interference with a contractual relationship based on Arneault's

alleged involvement in soliciting Rubino to join as a plaintiff in the Civil Rights Lawsuit.  Count

4 asserted a claim for breach of contract premised upon Arneault's alleged violation of non-

disclosure and confidentiality clauses in the Settlement Agreement.   Count 5 asserted a claim for

breach of contract premised upon Arneault's alleged violation of a non-disparagement clause contained in the Settlement Agreement. Count 6 asserted a violation of Pennsylvania's Trade Secrets Act premised upon Arneault's alleged activities while associated with AHT. (Compl., ECF No. 1.)

### 2. Arneault's Motion to Dismiss the Complaint

In November 2011 Arneault filed a motion to dismiss the complaint in its entirety (ECF No. 11). This motion was aggressively briefed by both parties (ECF Nos. 12, 13, 17, 18, 19, 20, 21) and was argued at a motion hearing (ECF No. 22).

On September 27, 2012, Judge McLaughlin entered a memorandum opinion and order (ECF No. 23) dismissing all of the counts of the complaint with the exception of Count 3. Counts 1, 2, 4, and 5 were dismissed without prejudice to be litigated in the Circuit Court of Hancock County, West Virginia pursuant to a forum selection clause contained in the Settlement Agreement. Count 6 was dismissed with prejudice pursuant to a release provision contained in the Settlement Agreement. Judge McLaughlin denied Arneault's motion to dismiss with respect to Count 3. Consequently, the only claim currently pending against Arneault is MTR's claim for alleged tortious interference with a contractual relationship.

### 3. Arneault's Counterclaims

On September 28, 2012, Arneault filed his answer to MTR's remaining claim (ECF No. 24). At the same time, Arneault asserted counterclaims for abuse of legal process (Count I) and defamation (Count II) (*id.* at ¶¶89-127).

Arneault's first counterclaim is premised on the theory that MTR has abused the legal process by virtue of its conduct in prosecuting this case. In brief, Arneault alleges that MTR's abuse of a legal process took three forms, *i.e.,*: (i) the filing of "an obviously non-meritorious

Complaint" in this case (Answer and Countercl. ¶122, ECF No. 24); (ii) the continued defense of certain claims in this litigation even after a West Virginia state court had ruled that those claims could not be litigated in this forum; and (iii) the manner in which process was served upon Arneault. (*See* Answer and Countercl. ¶¶ 122-23.)

Arneault's second counterclaim alleges defamation in connection with a letter that MTR's counsel in this matter, Elliot Greenleaf, Esq., sent to the Ohio Lottery Commission (the "Commission") on September 6, 2012. The correspondence in question was sent in response to a letter that Arneault's attorney, John F. Mizner, Esq., had previously sent to the Commission on August 29, 2012.

Mr. Mizner's August 29, 2012 correspondence was designed to bring to the Commission's attention an incident that had occurred earlier that month at Scioto Downs, a gaming facility owned by MTR and licensed by the Commission. In relevant part, the correspondence stated as follows:

> On August 9, 2012, Mr. Arneault was invited to lunch by a major fellow MTR shareholder at the dining area of Scioto Downs, which is adjacent to the area of the facility licensed for video lottery gaming. While Mr. Arneault was talking with the shareholder, Mr. Arneault was approached by management in the person of Scioto Downs attorney Thomas Diehl who demanded that Mr. Arneault leave Scioto Downs.
>
> Mr. Arneault was confused by this request, as neither he nor his companion had been acting in a disruptive fashion, and he therefore asked why he was being required to leave Scioto Downs. The individual asking Mr. Arneault to leave advised him that he was being required to leave because Mr. Arneault was engaged in ongoing litigation with MTR, an Erie, Pennsylvania-based subsidiary of MTR, and several current and former MTR officials and employees. The litigation in question does not involve Scioto Downs or MTR's Ohio operations in any manner.
>
> Needless to say, Mr. Arneault was quite embarrassed and disappointed that he was removed from Scioto Downs in front of a fellow MTR shareholder when he was doing nothing more than eating lunch with the shareholder and discussing business. More important for the purposes of this letter, however, are the ramifications of this incident for the Ohio Lottery.
>
> Scioto Downs is currently the only video lottery licensee in Ohio. Therefore, unlike every other game offered by the Ohio Lottery, video lottery games may be played only at

one place in Ohio: on the premises of Scioto Downs. The exclusion of Mr. Arneault from Scioto Downs, then, operates to exclude him from playing video lottery games in Ohio at all.

This flies in the face of the rules promulgated by the Ohio Lottery, which are clear that lottery games, including video lottery games, should be made as widely available as possible to the public. Ohio Admin. Code §3770-4-03 provides that lottery licensees are expected to make their facilities available to the public "twenty-four hours per day, seven days per week," §3770:2-6-01(A), and Game Rule Number Sixty strongly suggests that video lottery games should be available to any person who qualifies as a "video lottery participant" at any time "during the established hours of operation for video lottery,["] §3770:2-10-60(F).

***

Since Mr. Arneault is a video lottery participant with a right under section 3770:2-7-01(A) to play video lottery games and is not excluded from playing video lottery games by section 3770:2-7-01(B), Scioto Downs did not have proper cause for ejecting Mr. Arneault from its grounds and, therefore, preventing him from playing video lottery games.

Finally, section 3770:1-6-02 provides that "[a] person **shall** be able to play any game operated by the state lottery by purchasing a ticket issued by the state lottery." (emphasis added). This provision, cast in mandatory terms with the use of the word "shall", creates a mandate that members of the public be permitted to play lottery games. …

The import [of the language in §3770:1-6-02] is quite clear: video lottery games are to be open to the public, except in the limited circumstances described therein. However, because of the actions of the management at Scioto Downs – currently the only video lottery licensee in Ohio – Mr. Arneault has been effectively barred from playing video lottery games in Ohio.

While the common law rule that business owners have the right to exclude those whom they deem undesirable from their premises still survives under some circumstances today, Scioto Downs has contracted away those rights by becoming a licensee of the Ohio Lottery under the video lottery rules and regulations. Scioto Downs is therefore bound to make its video lottery games available to the general public absent one of the reasons contained in the lottery regulations.

The sole reason Mr. Arneault was removed from Scioto Downs' premises is that he exercised his First Amendment right of access to the courts by filing lawsuits against MTR and defending a lawsuit brought by MTR against Mr. Arneault. These lawsuits – none of which have anything to do with Scioto downs or gaming in Ohio – simply cannot be the basis for banning Mr. Arneault from playing video lottery games at Scioto Downs and, in effect, in Ohio.

As you are no doubt aware, video lottery games at racetracks are a highly contentious issue in Ohio at present. The actions of Scioto Downs in removing Mr. Arneault from their facility for exercising his First Amendment right of access to the courts have the potential to embarrass the Ohio Lottery and provide additional fodder to opponents of gaming in Ohio. Such an outcome would not be in the interest of the Ohio Lottery, Scioto Downs, or Mr. Arneault.

Be advised that we intend to make similar requests to the gaming authorities in Pennsylvania and West Virginia asking for declaratory relief in advance preventing MTR and its subsidiaries from further violating Mr. Arneault's rights, embarrassing him, and violating gaming regulations.

Your leadership is necessary to resolve this issue with Scioto Downs and to ensure that this does not happen to anyone else who is legally permitted to play video lottery games. Please contact Scioto Downs, advise them of their responsibility under the video lottery regulations to allow Mr. Arneault to enter their facilities and play video lottery games, and ask that they cease and desist from engaging in this unlawful conduct.

If I can provide any further assistance to help the Ohio Lottery investigate these claims or resolve this situation, please do not hesitate to contact me. …

(Answer to Countercl., Ex. 1, ECF No. 43-1.)

As noted, Mr. Greenleaf's letter response to the Commission, dated September 6, 2012, serves as the basis for Arneault's defamation counterclaim. In relevant part, Mr. Greenleaf's letter states the following:

We represent MTR Gaming Group, Inc. and its affiliate Scioto Downs, Inc. ("MTR"), with regard to an August 29, 2012 letter to you from Mr. John F. Mizner, Esquire, counsel for Mr. Edson Arneault. Mr. Mizner's letter makes blatantly false and scurrilous accusations designed to disparage and maliciously harm MTR.

Among other things, Mr. Mizner states that since February 17, 2010 his client, Mr. Arneault, has not had any contractual relationship with MTR. This is knowingly false. Enclosed is a copy of the federal court suit against Mr. Arneault for breach of his continued contractual obligations to MTR, including his theft of trade secrets, misappropriation of confidential information, and tortious interference with MTR's business. Mr. Mizner's letter itself further demonstrates Mr. Arneault's ongoing malicious motives to harm MTR's business, including by breaching his continued contractual obligation not to "directly or indirectly, make or cause to be made any statements to any third parties defaming, slandering, criticizing, or disparaging "MTR and its affiliates], or otherwise negatively commenting on the character or reputation of [MTR and its affiliates]."

As for what occurred on August 9, 2012, Mr. Arneault was politely, professionally and courteously requested to leave the premises, which a premises owner has every right to do, especially given the allegations of Mr. Arneault's past misconduct of stealing trade secrets, assisting competitors in violation of contractual obligations, and otherwise interfering with MTR's business. To be clear, requesting Mr. Arneault to leave MTR's premises has absolutely nothing whatsoever to do with what Mr. Mizner disingenuously pretends to be an "exercise [of Mr. Arneault's] his [sic] First Amendment right of access to the courts." Moreover, even if one entertains Mr. Mizner's frivolous and tortured misinterpretation of the Ohio law and regulations governing the operation of Video Lottery Terminal Facilities, to fabricate some alleged "violation", his argument is baseless on its face. Conspicuously absent from his letter is any assertion that Mr.

Arneault purchased or sought to purchase a video lottery ticket, or engaged in any play on a video lottery terminal. Indeed, even if one is to believe Mr. Mizner's letter it clearly states that Mr. Arneault's purpose for being on the premises was "<u>nothing more</u> than eating lunch with the shareholder and discussing business."

We regret that Mr. Mizner is attempting to involve the Ohio Lottery Commission in some private agenda for a legal strategy he has against MTR. Rest assured, Scioto Downs is in strict compliance with Ohio's video lottery regulations and horse racing laws and will ensure that lawful lottery participants enjoy their experience in its video lottery facility and race track. …

(Answer to Countercl. Ex. 2, ECF No. 43-2.)

### 4. MTR's Motion to Dismiss the Counterclaims

On October 22, 2012, MTR moved to dismiss the counterclaims for failure to state a claim upon which relief can be granted (ECF No. 25). In support of its motion, MTR argued that: (A) both of Arneault's counterclaims are barred by the *Noerr-Pennington* doctrine; (B) Arneault failed to plead a viable abuse-of-process claim because he has not alleged any perversion of process subsequent to the issuance of process; (C) MTR's allegedly defamatory statements are conditionally privileged and/or subject to the fair reporting privilege and are, therefore, not actionable; and (D) Arneault has failed to plead the elements necessary to establish a plausible defamation claim. (*See* generally MTR's Mem. Law Supp. Mot. Dismiss. Def.'s Countercl., ECF No. 26.) Attached to MTR's supporting memorandum were copies of the two letters referenced above that form the basis of Arneault's defamation claim. (ECF No. 26-1 and 26-2.) Arneault filed his response to MTR's motion and supporting materials (ECF No. 30) on November 21, 2012.

Following Judge McLaughlin's resignation in August 2013, this matter was reassigned to the Honorable Arthur J. Schwab (ECF No. 33). On August 29, 2013, Judge Schwab entered a Memorandum Order in which he found it "clear from [the parties'] submissions that discovery needs to be conducted before this Court can determine whether the legal claims asserted by

Arneault in his Counterclaims are legally sufficient." (Mem. Order Denying Mot. Dismiss 2, Aug. 29, 2013, ECF No. 34.) Accordingly, Judge Schwab denied MTR's motion "without prejudice to re-raise the same issues at an [sic] a more appropriate time following discovery on those issues." (Id. at 3.)

### 5. MTR's Motion for Judgment on the Pleadings

On September 13, 2013, this case was transferred to the undersigned upon the consent of the parties (ECF No. 42). In accordance with the provisions of 28 U.S.C. §636(c)(1), this Court is authorized to conduct all proceedings in this case, including trial and entry of a final judgment.

That brings us to the currently pending motion for judgment on the pleadings, which MTR filed on March 24, 2014 (ECF No. 51). This motion has been fully briefed by both parties (ECF Nos. 52, 54, 55, 56, 57) and all issues raised in the motion have been adequately joined. Consequently, the matter is ripe for disposition.

## II. Standard of Review

"The standard for deciding a motion for judgment on the pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) is not materially different from the standard for deciding a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Zion v. Nassan*, 283 F.R.D. 247, 254 (W.D. Pa. 2012). Either motion may be used to seek the dismissal of a complaint based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6), (h)(2)(B). The only difference between the two motions is that a Rule 12(b) motion must be made before a "responsive pleading" is filed, whereas a Rule 12(c) motion can be made "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(b), (c). A court presented with a motion for judgment on the pleadings must consider the plaintiff's complaint, the defendant's answer, and any written instruments or exhibits attached to the pleadings. *Perelman v.*

*Perelman*, 919 F. Supp. 2d 512, 521 (E.D. Pa. 2013). *See also* 2 James Wm. Moore et al., Moore's Federal Practice–Civil ¶ 12.38 (2010); *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.3d 1192, 1196–97 (3d Cir.1993) (court should consider the allegations in the pleadings, the attached exhibits, matters of public record, and "undisputedly authentic" documents if plaintiff's claims are based on such documents).

A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41 (1957)). The Court need not accept inferences drawn by the claimant if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir.2004) (*citing Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997)). Nor must the court accept legal conclusions set forth as factual allegations. *Twombly*, 550 U.S. at 555 (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." *Smith v. Sullivan*, Civil Action No. 07-528-SLR, 2008 WL 482469, at *1 (D. Del. Feb. 19, 2008) (*quoting Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation

that discovery will reveal evidence of" the necessary element." *Phillips*, 515 F.3d at 234

(*quoting Twom*bly, 550 U.S. at 556 n. 3).

The Third Circuit has broken down the relevant standard of review into the following

three steps:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir.2011) (*quoting Santiago v.*

*Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

## III. Discussion

A. <u>The Law-of-the-Case Doctrine</u>

In its motion for judgment on the pleadings, MTR asserts virtually all of the same

arguments that were previously raised in its motion to dismiss the counterclaims. As far as this

Court can discern, there are only two substantive differences: first, the pending Rule 12(c)

motion abandons the argument, previously raised in MTR's Rule 12(b)(6) motion, that Arneault

has failed to plead facts sufficient to satisfy all of the elements of a plausible defamation claim;

second, the pending Rule 12(c) motion adds an argument that absolute judicial privilege bars any

recovery by Arneault for the alleged defamation.

In view of these circumstances, Arneault contends that this Court should deny MTR's

motion for judgment on the pleadings out of hand based on Judge Schwab's prior ruling, which

Arneault maintains is the law of the case. MTR disputes that the "law of the case" doctrine

applies here.

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Hasan*, 468 F. App'x 96, 98 (3d Cir. 2012) (*quoting Farina v. Nokia, Inc*., 625 F.3d 97, 117 n. 21 (3d Cir. 2010)) (internal quotation marks omitted). The doctrine has developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing [case]." *Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848, 856 (3d Cir.1994) (internal quotation marks and citation omitted). It has been applied not only to judges being asked to reconsider their own rulings but also to successor judges who are asked to reconsider the rulings of their predecessors. *See, e.g., Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816 (1988) ("[T]he doctrine applies as much to the decision of a coordinate court in the same case as to a court's own decisions."); *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir.1957) ("judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other.").

The law-of-the-case doctrine "'does not restrict a court's power but rather governs its exercise of discretion.'" *Feesers, Inc. v. Michael Foods, Inc.,* 591 F.3d 191, 207 (3d Cir. 2010) (*quoting Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir.1997)). Although a district court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, "'as a rule [it] should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.'" *Id.* (*quoting Christianson v. Colt Indus. Operating Corp*., 486 U.S. at 816). Such "extraordinary circumstances" also include situations where new evidence has become available or where a supervening rule of law has been announced. *See Schneyder v. Smith,* 653 F.3d 313, 331-32 (3d Cir. 2011) (recognizing that the "law of the case" doctrine does

not apply where (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice) (citation omitted).

MTR argues that the "law of the case" doctrine has no application under the present circumstances. According to MTR, Judge Schwab did not issue a "rule of law" because he merely denied MTR's prior Rule 12(b)(6) motion without prejudice and without ruling on the merits of the defenses. MTR posits that the denial of a motion to dismiss without prejudice is not a "rule of law" for purposes of law of the case doctrine because such an order is interlocutory and the doctrine does not apply to interlocutory orders.

Aside from the one new issue (i.e. absolute judicial privilege) raised in MTR's Rule 12(c) motion, the remainder of the pending motion is functionally akin to a motion for reconsideration of Judge Schwab's prior ruling. Although fashioned as a motion for judgment on the pleadings, the motion incorporates virtually all of the same arguments as were raised in the Rule 12(b)(6) motion and, as discussed below, it is based on essentially the same record. In addition, as our previous discussion of the relevant standard of review makes clear, the legal principles governing this Court's analysis of the pending Rule 12(c) motion are functionally the same as those which governed Judge Schwab's analysis of the Rule 12(b)(6) motion. Moreover, because the affirmative defenses which MTR previously raised could properly be considered pursuant to Rule 12(b)(6),[2] there is no reason to infer (as MTR urges) that Judge Schwab's ruling did not encompass those arguments.

---

[2] Under the so-called "Third Circuit Rule," affirmative defenses may be raised by way of a Rule 12(b)(6) motion if the applicability of the defense is apparent on the face of the complaint. *See Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997); *U.S. ex rel. Black v. American Society for Engineering Educ.*, Civil Action No. 12-1139, 2014 WL 1765337, at *4 (E.D. Pa. May 2, 2014).

Even though district courts have the inherent power to reconsider interlocutory decisions, "'[c]ourts tend to grant motions for reconsideration sparingly and only upon the grounds traditionally available under Fed. R. Civ. P. 59(e).'" *Deeters v. Phelan Hallinan & Schmieg, LLP,* Civil Action No. 3:11-252, 2013 WL 6524625, at *2 (W.D. Pa. Dec. 12, 2013) (quoting *A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.,* CIV. A. 94-7408, 2001 WL 881718, at *1 (E.D. Pa. May 1, 2001)) (alteration in the original). This line of analysis invokes the same type of considerations outlined above, *to wit:* (1) whether there has been an intervening change in the controlling law; (2) whether there is new evidence that was not previously available; and (3) whether there is a need to correct a clear error of law or prevent manifest injustice. *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999); *Deeters,* 2013 WL 6524625, at *2. Because courts have a strong interest in the finality of their rulings, a motion for reconsideration should not be used as a vehicle for merely expressing dissatisfaction with a prior ruling. *Deeters, supra,* at *2; *D'Angio v. Borough of Nescopeck*, 56 F. Supp. 2d 502, 504 (M.D. Pa. 1999). Nor should a motion for reconsideration be used "as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002). *See also Deeters, supra*, at *2. Accordingly, reconsideration of MTR's previously raised arguments is not warranted absent a showing of (1) an intervening change in the controlling law; (2) the existence of new evidence not previously available, or (3) the need to correct a clear error of law that would otherwise result in a manifest injustice. *See Max's Seafood Café,* 176 F.3d at 677; *Deeters,* 2013 WL 6524625, at *2.

MTR has failed to establish that any of these circumstances are present here. First, no intervening change in the controlling legal principles is alleged and, as discussed, the standard of

review for present purposes is functionally the same as the standard that applied at the Rule 12(b)(6) stage.

Second, no new material evidence has been made available in connection with MTR's Rule 12(c) motion that was not previously available to the Court. As to this point, MTR argues that the record is different now because the two letters which form the basis of Arneault's defamation claim have been appended to MTR's answer to the counterclaims and, in addition, the Court now has the benefit of the averments which MTR set forth in its answer. As Arneault points out, however, the parties' respective letters to the Ohio Lottery Commission were previously appended to MTR's motion to dismiss, and there was nothing to prevent Judge Schwab from considering them because, at the Rule 12(b)(6) stage, a district court may consider any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir.1993). The reason for this rule is that a plaintiff with a legally deficient claim might otherwise survive a motion to dismiss simply by failing to attach to the complaint a dispositive document on which it relied. *Id.* Thus, the fact that MTR re-appended the letters to its answer does not functionally alter the record as it existed for Judge Schwab.

As for the averments which MTR has set forth in its answer to Arneault's counterclaims, this new information does not materially alter the Court's analysis in terms of the sufficiency of the counterclaims since Rule 12(c) – like Rule 12(b)(6) -- requires the Court to accept all of Arneault's well-pleaded factual averments as true. *See DiCarlo v. St. Mary Hosp.,* 530 F.3d 255, 262-63 (3d Cir. 2008); *Bradford v. Bolles,* Civ. No. 13–1910, 2014 WL 6895270, at *2 (D.N.J. Dec. 5, 2014). MTR contends that its averments in response to the counterclaims establish

"important factual context," including: (1) Arneault's prior refusal to accept service in this action that resulted in MTR arranging personal service upon Arneault; and (2) Arneault's initial violation of the Settlement Agreement's forum selection clause, which allegedly occurred when he filed a state law promissory estoppel claim against the MTR defendants in the Civil Rights Lawsuit. (MTR's Reply Br. Supp. Mot. for Judg. on Def.'s Countercl. 6 n.3, ECF No. 55.) Both pieces of "new information" highlighted by MTR concern the factual issue of whether MTR improperly used a legal process against Arneault. To the extent this new information renders reconsideration of MTR's prior arguments appropriate, however, the Court finds that MTR's averments do not alter the record in such a way as to make judgment in favor of MTR appropriate at this stage of the proceedings. At most, MTR's averments merely underscore the reality that certain factual issues bearing on Arneault's abuse-of-process claim are controverted, making entry of judgment inappropriate at this procedural juncture.

Finally, MTR has not alleged, and this Court does not find, any clear error in Judge Schwab's prior ruling as would result in manifest injustice if left uncorrected. Because Judge Schwab essentially deferred any final conclusions as to the sufficiency of Arneault's counterclaims until after discovery, MTR will have a full opportunity to defend those claims based on the arguments raised here.

In sum, then, this Court finds no basis to revisit the arguments previously raised in connection with MTR's prior Rule 12(b)(6) motion. To the extent MTR's averments in its answer to the counterclaims makes reconsideration appropriate, this Court finds no basis in those averments for altering Judge Schwab's ruling that further discovery is warranted in order to resolve these issues. The Court will, however, address MTR's assertion of the judicial privilege

as a defense to Arneault's defamation claim, as that is the one issue that was not previously raised by MTR at the Rule 12(b)(6) stage.

B. Judicial Privilege and the Defamation Claim

In Pennsylvania, it is well settled law that "a person is entitled to absolute immunity for communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." *Bochetto v. Gibson*, 860 A.2d 67 (Pa. 2004). *See also Lin v. Rohm and Hass Co.*, No. 2:11–cv–3158–WY, 2014 WL 1414304, at *11 (E.D. Pa. Apr. 14, 2014) (recognizing the rule and citing *Bochetto*).

Ohio similarly recognizes the absolute judicial privilege.[3] *See Surace v. Wulinger,* 594 N.E. 2d 939 (Ohio 1986) (holding that the doctrine of absolute privilege in a judicial proceeding bars a cause of action on an allegedly defamatory statement made in a pleading which bears some reasonable relation to the proceeding in which it appears). In *Surace,* the court explained the rationale behind the rule as follows:

> The most basic goal of our judicial system is to afford litigants the opportunity to freely and fully discuss all the various aspects of a case in order to assist the court in determining the truth, so that the decision it renders is both fair and just. While the imposition of an absolute privilege in judicial proceedings may prevent

---

[3]    As a federal court sitting in Pennsylvania, this Court's first task is to apply Pennsylvania's choice-of-law rules to determine which state's law governs the issue. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal district court must apply the forum state's rules concerning conflicts- of-law); *LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996) (same). Initially, we must determine whether a conflict actually exists between the laws of Ohio and Pennsylvania. *Titeflex Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 88 A.3d 970, 979 (Pa. Super. Ct. 2014) (citation omitted). If no conflict exists, then further analysis is unnecessary; however, if a conflict is found, this Court must determine which state has the greater interest in the application of its law. *Id*.

Here, both parties have cited to Pennsylvania and Ohio cases interchangeably in support of their respective positions concerning the applicability (or non-applicability) of the absolute judicial privilege. This Court does not perceive any significant conflict in terms how Ohio and Pennsylvania respectively apply this rule of law, and neither Arneault nor MTR have argued that such a conflict exists. Notably, the courts of both states have cited and applied the rule as set forth in § 586 of the Second Restatement of Torts. *See, e.g., Post v. Mendel,* 507 A.2d 351, 356-57 (Pa. 1986); *Simmons v. Climaco,* 507 N.E. 2d 465, 227-28 (Ohio Ct. App. 1986). In addition, at least one Ohio court has interpreted the rule by citing to a Pennsylvania ruling. *See Krakora v. Gold*, 98 CA 141, 1999 WL 782758, at *3 (Ohio App. 7 Dist. Sept. 28, 1999) (discussing the policy reasons for the privilege and citing to *Buschel v. Metrocorp,* 957 F. Supp. 595, 598 (E.D. Pa. 1996)). Accordingly, for present purposes, this Court finds no conflict between the laws of Pennsylvania and Ohio insofar as they relate to the absolute judicial privilege. Decisions from both jurisdictions will therefore be relied on by the Court without further conflict-of-laws analysis.

redress of particular scurrilous and defamatory allegations that tend to harm the reputation of the person defamed, a contrary rule, in our view, would unduly stifle attorneys from zealously advancing the interests of their clients in possible violation of the Code of Professional Responsibility, and would clog court dockets with a multitude of lawsuits based upon alleged defamatory statements made in other judicial proceedings. The proper balance that must be made is that which we have set forth today. We believe that the standard requiring that the alleged defamatory statement bear some reasonable relation to the judicial proceeding in which it appears is the proper restraint which should be made in order to insure the free and open discussion of competing interests that is a necessary part of our adversarial system of justice.

495 N.E. 2d at 944.

The absolute judicial privilege extends to statements made in connection with "quasi-judicial" proceedings. *See Doe v. Mount Vernon City Sch. Dist. Bd. of Educ.,* Case No. 2:08-cv-575, 2010 U.S. Dist. LEXIS 34590, at *16 (S.D. Ohio Apr. 6, 2010). *See also Doe v. Wyoming Valley Health Care Sys., Inc.*, 987 A.2d 758, 766 (Pa. Super. Ct. 2009) (citing *Milliner v. Enck*, 709 A.2d 417 (Pa. Super. Ct.1998)). Thus, the privilege applies to "any hearing before a tribunal which performs a judicial function, including many administrative officers, boards and commissions, so far as they have the powers of discretion in applying the law to the facts which are regarded as judicial or 'quasi-judicial' in character." *Milliner v. Enck*, 709 A.2d at 419 n.1 (Pa. Super. Ct. 1998). *Cf. Beachland Ents., Inc. v. Cleveland Bd. of Rev.,* No. 99770, 2013 WL 6730921, at *2 (Ohio Ct. App. Dec. 19, 2013) (the proceedings of administrative officers and agencies are "quasi-judicial" where there is a requirement of notice, hearing, and the opportunity to introduce evidence through witnesses; there is no requirement of subpoena power) (citing *M.J. Kelley Co. v. City of Cleveland,* 290 N.E. 2d 562, 564-65 (Ohio 1972)).

In this case, MTR contends that the absolute judicial privilege bars any defamation claim based on Mr. Greenleaf's September 6, 2012 letter to the Ohio Lottery Commission. According to MTR, the Commission has "quasi-judicial" authority relative to licensing issues in the gaming

industry and MTR, through Mr. Greenleaf, was merely responding to Mr. Mizner's previous letter to the Commission asking that the Commission address allegedly unlawful conduct on the part of MTR's subsidiary, Scioto Downs.

In his reply, Arneault does not dispute the Commission's status as an agency with quasi-judicial powers.[4]  Nevertheless, Arneault maintains that the privilege does not apply here because there is nothing in the record to suggest that his counsel's letter to the Commission ever resulted in an investigation or a proceeding of any kind.  This argument is unpersuasive.

Court have recognized that, "[t]o permit an attorney to best serve a client, the privilege must be broad enough to include occasions when a client's cause is being advocated under less formal circumstances." *Smith v. Griffiths,* 476 A.2d 22, (Pa. Super. Ct. 1984).  "Thus, the privilege extends to and includes preliminary demands, as well as informal conferences and negotiations conducted after litigation has been commenced or when litigation is seriously contemplated." *Id.* (applying the absolute privilege to letters written by an attorney to a quasi-judicial officer appointed to hear issues that were part of a pending divorce proceeding involving the attorney's client).  *See also Simmons v. Climaco*, 507 N.E. 2d 465 (Ohio Ct. App. 1986) (holding that the absolute judicial privilege applied to pre-indictment communications made by an attorney that were critical of law enforcement agents' conduct in connection with an ongoing

---

[4] The Ohio Revised Code and Ohio Administrative Code afford the Executive Director of the Oho Lottery Commission broad authority in matters of licensing.  *See generally* OHIO REV. CODE ANN. §§3770.02 (E), 3770.05(B)-(E); OHIO ADMIN. CODE 3770-3-01(A) (granting the Director authority to suspend or revoke the license of a licensee "who does not comply with the Lottery Act and all rules, conditions, regulations, standards and orders adopted, promulgated or issued thereunder by the commission or the director"); *id.* at 3770:2-1-01(D) (giving the lottery exclusive jurisdiction over all matters within the scope of its authority); *id.* at 3770:2-3-05(A)(1) (giving the Director the general authority to suspend or revoke a video lottery license of a licensee "who does not comply with the Lottery act, all rules, terms and conditions, policies, orders and directives adopted, promulgated or issued by the commission or the director…").  When making licensing suspension or revocation decisions, the Commission is generally required to act in accordance with Ohio's Administrative Procedures Act, OHIO REV. CODE ANN. §§ 119.01, *et. seq. See* OHIO ADMIN. CODE 3770-1-02 (C) (decisions and order of the Director in conducting the licensing function "shall be made or adopted in compliance with the Administrative Procedure Act."); *id.*at 3770:1-2-02 (licensing function of the Commission and Director "shall be in accordance with the Administrative Procedure Act," except in limited situations where the Director is authorized to suspend a license without a prior hearing).

grand jury investigation that was focused on the client); *Krakora v. Gold,* No. 98 CA 141, 1999 WL 782758, at *4 (Ohio Ct. App. Sept. 28, 1999) (applying the privilege to pre-litigation communications made by insured's legal counsel which involved allegedly defamatory statements about insurance company's proposed polygraph expert); Restatement (Second) of Torts §§ 586, 587 (1977) (recognizing that attorneys and parties, respectively, are absolutely privileged to publish defamatory matter concerning another "*in communications preliminary to a proposed judicial proceeding*, or in the institution of, or during the course and as a part of, a judicial proceeding" if the defamatory matter "some relation to the proceeding.") (emphasis supplied).

Notably, courts have applied the absolute judicial privilege to allegedly defamatory statements made in connection with complaints to prosecutorial authorities. Instructive in this regard is the decision in *Pawlowski v. Smorto,* 588 A.2d 36 (Pa. Super. Ct.1991). In that case, the court held that the absolute privilege applied to statements which certain parties had made to the district attorney and state police accusing an attorney of perjury in an unrelated civil proceeding. The court cited with approval Section 587 of the Restatement (Second) of Torts[5] and comment b thereto, which states (in relevant part) that the absolute judicial privilege applies to "*information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit.*" 588 A.2d at 42 (quoting Restatement (Second) Torts §587, comment b (1977)) (emphasis in the original). In expressing its concurrence with this rule, the court explained that:

---

[5] Section 587 provides that: "A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." Restatement (Second) Torts, §587 (1977).

according absolute privilege to statements made in or preliminary to judicial proceedings aims at ensuring free and uninhibited access to the judicial system. This policy is obviously served by application of the privilege to statements made solely to law enforcement officials for the purpose of initiating criminal charges. Although such statements may ultimately prove to be false or maliciously motivated, the same may be said of statements made by a party who consults with his or her attorney preliminary to instituting a civil action, or of statements made by counsel in preliminary conferences or negotiations on their client's behalf. Nevertheless, such statements are deemed to be absolutely privileged because the policy concerns stated above outweigh the right of the defamation plaintiff to seek redress for harm caused by the statements.

*Id.* (citing cases).

The Ohio Supreme Court reached a similar result in *M.J. DiCorpo, Inc. v. Sweeney,* 634 N.E.2d 203 (Ohio 1994). Like the Pennsylvania Superior Court in *Pawlowski,* the court in *M.J. DiCorpo* applied the absolute judicial privilege to statements in an affidavit submitted to a prosecutor for purposes of reporting the alleged commission of a crime. 634 N.E. 2d at 209. The court explained that, "[a]s a matter of public policy, extension of an absolute privilege under such circumstances will encourage the reporting of criminal activity by removing any threat of reprisal in the form of civil liability," and "[t]his, in turn, will aid in the proper investigation of criminal activity and the prosecution of those responsible for the crime." *Id.* Recalling its recent holding in *Hecht v. Levin,* 613 N.E.2d 585 (Ohio 1993) -- that a complaint filed with the grievance committee of a local bar association is part of a judicial proceeding and therefore absolutely privileged, the court likened "the filing of an affidavit, information or other statement with a prosecuting attorney" to the type of communication at issue in *Hecht:*

The filing of a grievance with the local bar association sets the process in motion for the investigation of the grievance and the possible initiation of a formal complaint. Similarly, the filing of an affidavit, information or other statement with a prosecuting attorney may potentially set the process in motion for the investigation of a crime and the possible prosecution of those suspected of criminal activity.

634 N.E. 2d at 209. The court concluded it would be "anomalous to recognize an absolute privilege against civil liability for statements made in a complaint filed with a local bar association, while denying the protections of that privilege to one who files an affidavit with the prosecutor's office reporting that a crime has been committed." *Id.* Thus, the court viewed the allegedly defamatory affidavit as the "initial step" in a judicial proceeding as to which absolute immunity would apply. *Id.* at 209-10.

Consistent with the above-cited cases, the Court finds it likely that Mr. Mizner's initial letter to the Ohio Lottery Commission, if challenged by MTR, would be covered by the absolute judicial privilege. Through this communication, Arneault and his attorney requested that the Commission use the authority endowed to it under Ohio law to redress a perceived violation of the state's gaming rules – a matter clearly within the Commission's jurisdiction. Although Arneault and Mizner could not know, as of the time their letter was sent, whether or how the Commission would act on their request, it was clearly the expressed hope of Arneault and Mizner that some form of action favorable to Arneault and adverse to MTR would be taken. The possibility that the Commission would commence some type of inquiry or investigation was at least within the realm of reasonable contemplation and, indeed, Mr. Mizner offered his assistance in this regard. Under these circumstances, the Court believes it likely that Mizner's letter to the Commission is the type of communication that would likely fall within the scope of the absolute judicial privilege.

That being the case, the only sensible conclusion is that MTR's letter in response is similarly privileged. Having been copied on a letter accusing MTR's subsidiary of "unlawful conduct," Mr. Greenleaf sent the September 6, 2012 correspondence in his role as legal counsel setting forth MTR's version of events, presumably to pre-empt any possible legal problems that

might arise as a result of Mr. Mizner's prior correspondence. Accordingly, this Court views Mr. Greenleaf's letter as akin to the type of communications that traditionally receive absolute protection – i.e., communications that are issued in the "normal course" of quasi-judicial proceedings and "pertinent and material" to such proceedings. *See, e.g., Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986) ("[T]he protected realm has traditionally been regarded as composed only of those communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought."); *Michaels v. Berliner*, 694 N.E. 2d 519, 522 (Ohio Ct. App. 1997) (under absolute privilege for judicial proceedings, "witnesses, parties, attorneys, and judges are protected while functioning as such in the usual and regular course of judicial proceedings" with regard to statements having "some reasonable relation to the judicial proceeding in which it appears") (citing authority).

This result is in keeping with one of the primary policy considerations underlying the privilege – namely, to ensure zealous and effective representation by attorneys on behalf of their clients and thereby assist the adversarial process. Accordingly, based on the facts currently of record, this Court is unwilling to conclude that MTR cannot avail itself of the absolute judicial privilege insofar as Arneault seeks to pursue his defamation claim on the basis of Mr. Greenleaf's correspondence to the Ohio Lottery Commission.

Nevertheless, the Court will defer a definitive ruling on this issue at this juncture. Under either Ohio or Pennsylvania law, the judicial privilege may be forfeited where the communication in question has been shared with parties not having a direct interest in the subject matter of the communication. *See, e.g., Pawlowski,* 588 A.2d at 41 n.3 (noting that the absolute judicial privilege may be lost through publication of defamatory material to unauthorized persons); *State v. Baumgartner,* No. OT-02-029, 2004 WL 1662206, at *5 (Ohio Ct. App. 2004)

(to come within the privilege, an extrajudicial communication must, among other things, be "published only to persons who are directly interested in the proceeding") (citation omitted).

In this case, the recipients of Mr. Greenleaf's September 6, 2012 letter include "C. David Paragas, Esquire." Although MTR represents that Mr. Paragas is one of MTR's and Scioto Downs's legal counsel, Arneault points out that this information and the scope of Mr. Paragas's agency is not of record, and it is yet unknown whether Mr. Greenleaf's letter may have been shared with other individuals not designated as intended recipients. The Court will therefore permit Arneault an opportunity to explore these issues during discovery. MTR's motion to dismiss on the basis of absolute judicial privilege will be denied without prejudice such that MTR can reassert this argument, to the extent appropriate, on a more fully-developed record.

## IV. Conclusion

Based upon the foregoing reasons, MTR's motion for judgment on the pleadings will be denied. The denial will be without prejudice to MTR's right to reassert the arguments in its motion on a more fully developed record consistent with Rule 56 of the Federal Rules of Civil Procedure.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**MTR GAMING GROUP, INC.,**               )
                                              )
                    **Plaintiff,**               )
                                              )          **Case No. 1:11-cv-208-SPB**
            **v.**               )
                                              )
**EDSON R. ARNEAULT,**               )
                                              )
                  **Defendant.**               )

**O R D E R**

AND NOW, this 9th day of January, 2015;

IT IS HEREBY ORDERED for the reasons set forth in the accompanying Memorandum

Opinion that Plaintiff's Motion for Judgment on the Pleadings [ECF No. 51] is DENIED.


/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge
